FILED
08/14/2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| PAULO C. LISBOA,<br>(D/B/A/ LUCIANO CASTELLANI)<br>(D/B/A/ TOY SOLDIER CENTRAL™)<br><br>Plaintiff,<br><br>v.<br><br>PAUL KNAPP,<br><br>Defendant. | 1:26-cv-02582-RDA-WEF<br>Case No.: 1:25CV-2582 -RDA-WEF<br><br>*Jury Trial: Demanded*<br><br>⁂<br><br>*Damages Demanded: $6,000,000.01*<br><br>⁂<br><br>*Ghostwriting Certification: Included* |

**COMPLAINT**

This case arises from Paul Knapp's alleged (1) contribution to false source attribution of tangible goods — *WWII Waffen-SS* toy soldiers physically produced by Plaintiff; (2) Knapp's publication of a podcast which amplified that confusion and (3) defamed Plaintiff; (4) publishing the video despite his own understanding and acknowledgment of the false-attribution chain; (5) refusal to remove the podcast after receiving notice that it was causing actual reputational and commercial harm to Plaintiff; (6) Knapp's subsequent malicious public escalation; and (7) commission of those acts while serving as Plaintiff's paid commercial affiliate, associate, vendor, and bailee.

**RELATED CASE:**

*Lisboa v. Aldo*, No. 1:26-cv-00718-MSN-WEF (E.D. Va.)

*A motion requesting consolidation has been filed in the above related case.*

## TABLE OF CONTENTS


**I. PARTIES** .......... **1**

**II. JURISDICTION AND VENUE** .......... **1–2**

**III. FACTUAL ALLEGATIONS** .......... **3–38**

*A*. Preliminary Statement: The Case Made Plain ◇ .......... 3

*B*. Plaintiff's Prior Independent Success in the Industry ◇ .......... 3–6

*C*. When Plaintiff and Knapp First Became Business Associates ◇ .......... 6–8

*D*. Knapp Solicits a Commercial Vendor Role for Plaintiff's Physical Goods ◇ .......... 8–11

*E*. How Knapp's Direct Actions Injured Plaintiff at the 2025 Chicago Toy Show ◇ .......... 11–16

*F*. Actual Source Confusion Caused by Knapp's Actions ◇ .......... 16–17

*G*. Knapp's Toy Soldier Tuesday Podcast ◇ .......... 17

*H*. Knapp's January 2026 Podcast Episode ◇ .......... 17–19

*I*. Knapp's February 2026 Podcast Episode ◇ .......... 19–22

*J*. Plaintiff's Injuries Resulting from the February Video ◇ .......... 22–24

*K*. Plaintiff's Private Request For Removal of the February Video ◇ .......... 24–25

*L*. Knapp's Refusal to Remove the February Video After Notice of Actual Harm ◇ .......... 25–27

*M*. Knapp's Escalation into Public Spectacle, Source Confusion, and Defamation ◇ .......... 27–32

*N*. Knapp's Ongoing Course of Malicious Misconduct and Defiance ◇ .......... 32–38

**IV. LEGAL CLAIMS (CAUSES OF ACTION)** .......... **38–71**

**COUNT I:** Violation of Section 43(a)(1)(A) of the Lanham Act .......... 39–41

**COUNT II:** Violation of Section 43(a)(1)(A) of the Lanham Act .......... 41–42

**COUNT III:** Violation of Section 43(a)(1)(B) of the Lanham Act .......... 42–46

**COUNT IV:** Violation of Section 43(a)(1)(A) of the Lanham Act .......... 46–49

**COUNT V:** Defamation *Per Se* .......... 49–53

**COUNT VI:** Defamation *Per Se* .......... 53–54

**COUNT VII:** Defamation *Per Se* .......... 54–57

**COUNT VIII:** Tortious Interference .......... 57–60

**COUNT IX:** Actual Fraud, Fraudulent Inducement, and Promissory Fraud .......... 60–63

**COUNT X:** Actual Fraud, Fraudulent Inducement, and Promissory Fraud .......... 63–65

**COUNT XI:** Conversion .......... 65–67

**COUNT XII:** Negligence .......... 67–69

**V. PRAYER FOR RELIEF** .......... **69–74**

**VI. RESERVATIONS, JURY DEMAND, AND SIGNATURE BLOCK** .......... **75**

*A*. Reservations of Rights ◇ .......... 75

*B*. Jury Demand ◇ .......... 75

*C*. Signature Block ◇ .......... 75

## I. PARTIES

i. **Plaintiff Paulo Castellani Lisboa** ("Plaintiff" or "Lisboa") is a resident of Woodbridge, Prince William County, Virginia.

ii. During the relevant period, Plaintiff conducted business in Virginia under the captioned trade names registered with the Virginia State Corporation Commission.

iii. Defendant Paul Knapp's false attribution, defamation, and the resulting harm to the reputation and goodwill of Plaintiff's trade names injured Plaintiff in Virginia.

iv. **Defendant Paul Knapp** ("Defendant" or "Knapp") is a resident of Virginia Beach, Virginia.

v. Knapp is a market-facing influencer within the military-miniatures and toy-soldier industry, maintaining roles as a reviewer, podcast host, affiliate, vendor, and former commercial associate of Plaintiff.

vi. Despite being a compensated commercial vendor of Plaintiff and having direct knowledge of Plaintiff's goods, business, and source-attribution concerns, Knapp engaged in false source attribution, defamatory publication and republication, malicious post-notice escalation, and tortious commercial interference directed at Plaintiff, which gave rise to this civil action.

## II. JURISDICTION AND VENUE

i. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Counts I–IV of this case arise under federal law, specifically Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

ii. This Court has original jurisdiction pursuant to 28 U.S.C. § 1338(a) because Counts I–IV arise under an Act of Congress relating to trademarks.

iii. This Court has supplemental jurisdiction over Plaintiff's related state-law claims — articulated in Counts V–XII — pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative facts as Plaintiff's Lanham Act claims.

iv. This Court has personal jurisdiction over Knapp because he is a Virginia resident.

v. This Court also has personal jurisdiction over Knapp because he purposefully directed the conduct at issue toward (1) Plaintiff; (2) Plaintiff's Prince William County, Virginia-based business and trade reputation; (3) and Plaintiff's business relationships throughout Virginia, including within and beyond Prince William County.

vi. Knapp traveled into Prince William County to meet Plaintiff and take possession of the Waffen SS toy soldier figures at issue here, after soliciting Plaintiff's collaboration.

vii. Knapp's solicitation of Plaintiff and subsequent venture into this Division are the catalyst of the commercial and reputational damages claimed within these pleaded allegations.

viii. The injuries caused by Knapp's conduct, were suffered by Plaintiff principally in Prince William County, Virginia: where he (1) resides; (2) operates *Toy Soldier Central*™; (3) manages its customers and affiliates; (4) receives business communications; (5) makes and manages sales from; and (6) maintains the goodwill that Knapp's conduct damaged.

ix. Venue is proper as to the District under 28 U.S.C. § 1391(b)(1) because Knapp resides within the Eastern District of Virginia.

x. Venue is proper as to the Alexandria Division under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and resulting business harm, reputational harm, and other injuries, occurred and were experienced principally within this Division.

## III. FACTUAL ALLEGATIONS

### A. Preliminary Statement: The Case Made Plain ◇

1. This case concerns Paul Knapp's course of misconduct over a ~15 month period.

2. Knapp is an active media publisher and toy soldier industry influencer.

3. He is also a former product vendor[1] and commercial collaborator of Plaintiff's.

4. Knapp is notably fluent in preaching virtues he did not practice.

5. For example, on April 16, 2025 Knapp advised Plaintiff to reproduce supposed "lost molds" from the original *Marx Toy Soldiers* line, **without** first confirming or obtaining permission or other proper licensure from *Victory Buy, Inc.* or *The Nacelle Company*.

6. Plaintiff halted the discussion to address the entities' inferred copyright interests.

7. Knapp persisted, but Plaintiff hushed and never revisited the proposal. *See* Exhibit 1.

8. But as Knapp grew hostile toward Plaintiff, Knapp (1) abandoned that position; (2) began publicly portraying Plaintiff as a supposed copyright infringer; and (3) defiantly shared, disseminated, or otherwise republished the unfounded defamatory video at issue in this action:

9. Knapp knowingly republished the defamatory video at issue in this action, after being put on notice of its injurious nature, on at least one occasion. *See* Exhibit 2.

### B. Plaintiff's Prior Independent Success in the Industry ◇

10. Plaintiff is the sole owner and operator of *Toy Soldier Central*™ ("TSC"), an award-winning military-miniatures brand that has operated continuously since ~ March 30, 2023.

11. Plaintiff also does business under the registered fictitious name, Luciano Castellani.

12. TSC designs, produces, manufactures, markets, and sells collectible toy soldiers — both as an original manufacturer *and* a licensed producer — locally and internationally.

---

[1] A "vendor" is a person who takes possession of another's products for the purpose of displaying, promoting, and selling those tangible goods to customers at commercial events, for compensation.

13. TSC was independently successful and commercially viable before Plaintiff's acquaintanceship with Knapp and before the events giving rise to this action.

14. Plaintiff already developed a meaningful commercial presence and reputation before knowing Knapp — through consistent sales, repeat customers, affiliate relationships, industry recognition, and publication in *Toy Soldier Collector International* Magazine.

15. Plaintiff's work and historical research have also been cited on public reference platforms, including the Wikipedia pages for "Toy Soldier" and "Army Men."

16. Plaintiff's reputation and public visibility had begun reaching broader public audiences through widely accessible reference platforms, media exposure, and recognition from prominent public figures.

17. Plaintiff and TSC even earned recognition from established industry participants and public figures, including placement on bestselling author George R. R. Martin's "For Collectors" page alongside prominent companies in the field, such as *Conte Collectibles*.

18. Richard L. Conte ("Conte") of *Conte Collectibles* ("Conte Co.") occupies an established position within the toy-soldier industry.

19. Conte's career also demonstrates that an established toy-soldier business can extend beyond the traditional collector market into mainstream celebrity-facing projects.

20. For example, Conte has released work associated with both George R. R. Martin, and Mel Gibson, namely toy soldier figures featuring Gibson in scenes from *The Patriot*.

21. Conte therefore serves as a comparator for the partnerships, affiliate revenues, promotional opportunities, goodwill, and commercial expansion impaired or lost elsewhere because other market participants encountered Knapp's accusations and reacted adversely.

22. Before the conduct alleged herein, Plaintiff and TSC were developing a similar upward commercial trajectory through increasing sales, industry recognition, affiliate relationships, media exposure, and opportunities for collaboration with established participants.

23. Conte's first awareness of Plaintiff and TSC arose through Knapp's publication, republication or dissemination of the defamatory video at issue in this Complaint.

24. Knapp's publication caused an important prospective industry relationship to begin under the shadow of Knapp's false characterizations and defamatory narratives, rather than through Plaintiff's products, reputation, or ordinary commercial outreach.

25. Despite that adverse introduction, Plaintiff subsequently developed and maintains a continuing commercial affiliation with Conte and Conte Co.

26. That surviving relationship demonstrates the caliber of industry participants Plaintiff is capable of fostering goodwill with.

27. The Conte relationship also evinces that Plaintiff's alleged losses were upon the disruption of an existing upward trajectory toward commercially valuable relationships.

28. Plaintiff maintained a diverse international customer base that included collectors, parents, professionals, legal academics, attorneys, medical professionals, and the judiciary.

29. Plaintiff also maintained active promotional relationships with online creators whose channels collectively reached millions of viewers and generated revenue for TSC.

30. During the relevant time period, those commercial relationships generated ~ $1,000 per month in affiliate-related profit and provided TSC with ample market exposure.

31. Plaintiff's reputation for honest attribution, product quality, commercial reliability, and fair dealing was a valuable business asset before Knapp published and republished the statements and source-attribution narrative challenged in this action.

32. Knapp's involvement with Plaintiff started with Knapp as a TSC customer.

33. Knapp then later sought to establish a collaborative commercial relationship with Plaintiff — involving product promotion, review, and sales — and approached him for work.

34. The goodwill and commercial opportunities generated by Plaintiff's established reputation included Knapp's own *unsolicited* effort to secure a commercial role with TSC, demonstrating the value of the relationships and opportunities later impaired by his conduct.

35. Plaintiff's continued growth does not negate that injury; Knapp's conduct nevertheless caused material harm to Plaintiff and his Virginia-based business.

### C. When Plaintiff and Knapp First Became Business Associates ◇

36. Knapp first contacted Plaintiff through eBay, then sought Facebook friendship from Plaintiff, then later proposed reviewing TSC products on his YouTube channel.

37. Plaintiff responded cordially and professionally — as he had previously experienced organic customers becoming voluntary product reviewers.

38. For example, Ben Daley ("Daley"), owner of *DaleyPlastic* — and other notable YouTube channels with tens of millions of aggregate views — similarly began as an ordinary customer who purchased and reviewed TSC products without Plaintiff soliciting them first.

39. Plaintiff offered Daley a commission-based affiliate arrangement and he accepted.

40. On February 27, 2025, Plaintiff offered Knapp the same type of affiliate arrangement, but Knapp stated: "You don't need to pay me bro. This is just a hobby."

41. As the acquaintanceship developed between the parties, Knapp became aware that Plaintiff was collaborating with *another* influencer in the miniature military collectibles industry: *supposed*[2] conceptual artist Christian Aldo ("Aldo"), a/k/a/ *The Plastic General* ("TPG").

[2] Aldo's purported "conceptual art" contribution proved vastly overstated. The work required extensive redesign, reconstruction, replacement geometry, and resculpting, followed by the eventual creation of entirely new files from scratch by an independent artist retained by Plaintiff.

42. Together, Aldo, Knapp, and Plaintiff agreed to participate in a joint commercial project: the *Waffen-SS Toy Soldier* figure line ("SS Figures"), which, because of Plaintiff (1) were physically produced; and (2) brought to market and commerce as completed, tangible goods.

43. The parties' agreement was limited to that one specific project: the SS Figures.

44. It did not confer upon anyone any proprietary interest in Plaintiff's businesses.

45. For the SS Figures project: Knapp served as the vendor, Aldo as the conceptual artist, Plaintiff as the project director, producer, manufacturer, and final product developer.

46. Sometime after the project began, Knapp learned from Plaintiff that Aldo had engaged in misconduct by five principal means: (1) inflating his role; (2) claiming sole authorship of the SS Figures; (3) claiming to be their primary manufacturer or commercial source; and (4) omitting Plaintiff and his business identities from the product's marketplace presentation; (5) after being put on both informal and formal notice to correct his course.

47. Plaintiff gathered evidence and filed a civil suit. *See Lisboa v. Aldo*, No. 1:26-cv-00718-MSN-WEF (E.D. Va.).

48. Knapp professed support for Plaintiff when informed of Aldo's misconduct in a text-based chat that occurred on December 10, 2025: he stated Aldo was "being a *[expletive]*" and expressed disbelief that Aldo "sold all those figures to Matt at Hobby Bunker."[3]

49. **Knapp further advised Plaintiff about how to handle the SS Figures: "What you should do is take his name off the bottoms of any future figures you sell."**

50. Plaintiff then described the parties' respective roles through a direct colloquial analogy: "I own a car company. He is a concept artist. He brings me a prototype of a car. I

[3] Aldo was alleged to have perpetuated a false narrative claiming to be the sole source of the goods produced by TSC, pawned off Plaintiff's inventory at a fraction of the cost to the largest toy soldier retailer in the United States, then pocketed the proceeds of that unauthorized exchange.

take it, invest $$$ *[sic]* into it, refine it with my engineers, and make it road worthy. That's my car — he's the original concept artist." Plaintiff claimed ***express*** ownership of the molds.

51. Knapp then ***expressly*** adopted Plaintiff's position, stating: "So any figures you make are yours not his."

52. Plaintiff confirmed, "100%," and **Knapp drove the point home: "So why put [Aldo's] name on them? Take his name off the bottoms."** *See* Exhibit 3.

53. Plaintiff initially expressed reluctance at Knapp's suggestion because he did not want to erase Aldo's contribution merely because the parties' relationship had deteriorated.

54. Plaintiff explained: "Because he was the concept artist" and "I wanted to share the credit." Plaintiff further stated, "I like to be fair. I honored his contribution."[4]

55. Thus, before Knapp later helped publish and republish Aldo's defamatory, contrary false-attribution narrative, Knapp had already (1) discussed the parties' roles, (2) received Plaintiff's detailed explanation, (3) observed Plaintiff's good-faith handling of the dispute, (4) agreed that the physical figures were Plaintiff's rather than Aldo's, and (5) expressly urged Plaintiff to remove Aldo's name from the finished tangible goods.

**D. Knapp Solicits a Commercial Vendor Role for Plaintiff's Physical Goods**

56. Knapp functioned as a compensated vendor of TSC products at two separate toy-soldier shows, namely a 2026 Gettysburg show and a September 2025 Chicago Show.

57. Knapp was entrusted to (1) take possession of Plaintiff's inventory; (2) display the goods at his vendor tables; (3) communicate with prospective buyers; (4) accept customer payments; (5) track sales; and (6) remit the post-deduction proceeds to Plaintiff's PayPal.

58. To the best of Plaintiff's knowledge, Knapp received approximately $310 in pay.

---

[4] Aldo's subsequent conduct ultimately caused Plaintiff to rescind even that good-faith gesture of voluntary attribution that captured Aldo's limited conceptual role. *See Lisboa v. Aldo.*

59. By April 29, 2025, Knapp — on his own volition — had published at least two favorable review videos featuring TSC products he had purchased from Plaintiff.

60. Knapp thereafter displayed for sale sets of his personally owned TSC inventory at the May 4, 2025 *Gettysburg Toy Soldier Show* as the private owner of those purchased goods.

61. On May 5, 2025, Knapp reported to Plaintiff that a vendor had characterized TSC as merely purchasing digital files and printing them, colloquially known as "print housing."

62. Plaintiff gave Knapp an immediate and direct explanation that TSC sold *three* distinct categories of products: (1) original designs created by Plaintiff; (2) designs created by artists retained by TSC; and (3) products manufactured under commercial licenses.

63. Plaintiff further explained that TSC transparently identified licensed and collaborative products in its marketplace descriptions.

64. Knapp sought that explanation — and accepted it — as guidance concerning what he should tell customers about *Toy Soldier Central*™.

65. During the same May 5, 2025 discussion, Knapp affirmatively solicited a broader commercial role from Plaintiff by expressly pitching himself as a TSC ambassador and vendor stating: **"I'd love to carry your products at shows and be a representative for the brand."**

66. Knapp did not identify any fee or compensation requirement at that time.

67. Knapp then proposed that Plaintiff supply him with physical TSC inventory to display and sell at toy-soldier conventions where Knapp maintained vendor tables and direct access to customers, collectors, and other industry collaborators.

68. Plaintiff relied upon Knapp's representations and entrusted him with substantial quantities of physical TSC goods for transport, display, promotion, and sale at conventions.

69. Knapp later conveyed to Plaintiff that during the 2025 Gettysburg Show, besides a few critics, the general reception of TSC's tangible goods had been substantially favorable.

70. The favorable reception and resulting sales reflected preexisting demand for TSC-branded products before Knapp assumed any formal vendor role.

71. Knapp, recognizing TSC's popularity, sought affiliation with the brand.

72. Knapp told Plaintiff that if supplied with additional inventory, Knapp was "more than happy to display it on [his] table and push [Plaintiff's] product free of charge."

73. On March 29, 2026, at approximately 9:32 a.m., during a ten-minute telephone call, Knapp expressly reneged upon his prior representation that he would display and "push" Plaintiff's products "free of charge," and required compensation for vending Plaintiff's sets.

74. The parties agreed that Knapp would deduct $100 from the proceeds of the April 2026 Gettysburg Show as purported "vendor fees and expenses."

75. On April 19, 2026, at approximately 4:07 p.m., while returning from the Show, Knapp informed Plaintiff by text message that he had "sold all the playsets."

76. On April 20, 2026 at approximately 11:13 a.m., Knapp remitted $360 to Plaintiff and identified that transfer as payment for "Civil war figures."

77. On April 20, 2026, at approximately 2:04 p.m., Plaintiff and Knapp participated in a six-minute telephone call during which Knapp confirmed that he had taken the agreed $100 deduction before remitting Plaintiff's remaining proceeds.

78. Plaintiff personally participated in both telephone calls, and a third-party witness present in the room overheard the material portions of both telephone conversations.

79. Knapp was acting as a compensated commercial vendor, entrusted with Plaintiff's inventory, sales proceeds, branding, customer presentation, and marketplace attribution.

80. That vendor relationship gave Knapp firsthand knowledge of the source, physical production, ownership, branding, and commercial presentation of Plaintiff's tangible goods.

**E. How Knapp's Direct Actions Injured Plaintiff at the 2025 Chicago Toy Show ◇**

81. In September 2025, Knapp maintained two vendor tables at the annual *Chicago Toy Soldier Show* ("Chicago Show"), and advised Plaintiff that he would be selling "[Knapp's] stuff[,] [Plaintiff's] stuff[,] Plastic General['s][5] as well as Helms items."

82. Knapp instructed Plaintiff to provide him with: (1) a complete inventory list of sets to sell; (2) sales prices of each set; and (3) display-ready examples of each TSC set.

83. Plaintiff complied and entrusted Knapp with the TSC inventory for the limited purpose of transporting, displaying, promoting, and selling it at the Chicago Show.

84. Knapp accepted possession of that inventory and was retained to act as Plaintiff's vendor, salesperson, promoter, and bailee at the Chicago Show in exchange for recompense.

85. Under that arrangement, Knapp was responsible for: (1) safeguarding the goods; (2) tracking authorized sales; (3) preserving Plaintiff's pricing and source identification; (4) accounting for proceeds; and (5) handling unsold sets according to Plaintiff's instructions.

86. Knapp's stated Chicago Show vending fee was presented to Plaintiff as ~ $210.

87. On or around September 24, 2025, Knapp personally traveled into Prince William County to meet Plaintiff and take possession of approximately thirty-two completed SS Figure sets supplied by Plaintiff, together with additional TSC products.

88. At that meeting, Knapp also showed Plaintiff the TSC-branded risers and display stands he represented would be used to display Plaintiff's inventory at the Chicago Show.

89. Knapp also showed Plaintiff several "*Plastic General*"-branded risers and display stands.

---

[5] Plaintiff understood *"Plastic General's"* as Aldo's personal collection items for Knapp to vend.

90. Plaintiff never authorized Knapp to display any tangible goods manufactured by *Toy Soldier Central*™ as having originated from any source other than TSC.

91. Plaintiff told Knapp to "not put the SS Figures on the *Plastic General* stands."

92. Knapp smiled, replied, "No, I won't do that, man," and tried to change the subject.

93. Plaintiff expressly repeated his instruction to not place the SS Figures on TPG stands and personally informed Knapp of Aldo's misconduct. *See* § III.C ¶¶ 46–48.

94. Plaintiff further explained that he alone had overseen the figures' development and commercial preparation, including prototype evaluation, revision, redesign, preparation of production-ready files, printing, washing, curing, finishing, bagging, and labeling.

95. Knapp therefore knew that the finished tangible goods originated from Plaintiff.

96. Nevertheless, while acting as Plaintiff's compensated commercial vendor and bailee, Knapp directly or indirectly displayed and offered the SS Figures for sale principally beneath *The Plastic General* branding rather than upon the *Toy Soldier Central* displays.

97. Knapp also directly identified or indirectly helped identify Aldo and TPG as the apparent commercial source, product line, manufacturer, or origin of the finished tangible goods Plaintiff had in fact produced and supplied — the SS Figures.

98. The presentation was especially misleading because Knapp separately displayed Plaintiff's *other* products as *Toy Soldier Central* goods while isolating the SS Figures beneath *The Plastic General* branding, thereby communicating that the SS Figures originated from a competing commercial source entirely — rather than from Plaintiff or through a collaboration.

99. At minimum, Knapp acted negligently; the pleaded facts also support a reasonable inference of knowing, reckless, deliberate, or malicious conduct.

100. Knapp's decision to present the SS Figures at a major commercial trade show as principally originating from Aldo and *The Plastic General* helped create and reinforce the marketplace confusion that Aldo exploited through the false-source-attribution narrative he began disseminating in or around August 2025, and added to the resulting commercial harm.

101. Both Knapp and Aldo financially benefited from Plaintiff while contributing to source-origin confusion concerning Plaintiff's tangible goods — including the SS Figures.

102. Knapp (1) received and transported the inventory, (2) controlled the vendor tables, (3) arranged or maintained the displays, (4) interacted with customers and industry participants, (5) collected payments, (6) tracked sales, (7) deducted his compensation, and (8) later remitted the remaining proceeds to Plaintiff through PayPal.

103. Plaintiff would never have entrusted Knapp with the aforementioned vendor responsibilities over TSC products had he known that Knapp would handle the SS Figures in a negligent, reckless manner that caused confusion regarding their source and origin.

104. Because Knapp was retained to vend the figures and exercised responsibility over the vendor tables and their displays, the misattribution occurred in one of several ways: either (1) Knapp moved the figures; (2) Aldo moved the figures with Knapp's knowledge and permission; or, alternatively, (3) Knapp negligently failed to supervise, preserve, or correct the source-identifying arrangement of Plaintiff's goods, regardless of who moved them.

105. Knapp also reported that one figure's stand was "pretty [expletive] up," without identifying when, how, or why the damage occurred.

106. Knapp also informed Plaintiff that Aldo had refused to permit certain figures to be sold, even though Knapp believed that the figures were neither damaged nor misprinted.

107. Such examples underscore Knapp's failures as a bailee entrusted with inventory.

108. Knapp's ensuing $1,053.50 "Toy show" remittance did not itemize whether, or to what extent, it included proceeds attributable to those five sets.

109. Knapp's authority over TSC inventory extended only to possessing it as necessary to display and sell the goods under the specific retail arrangements that Plaintiff approved.

110. Plaintiff never authorized Knapp to surrender custody or dominion to Aldo before any separately approved sale, nor authorized either Knapp or Aldo to decide unilaterally which goods would be sold or withheld, dismantle completed sets into loose figures beyond the approved six-figure groupings, sell loose figures at all, retain inventory without the agreed payment and accounting, or otherwise exercise control outside those limited terms.

111. Plaintiff entrusted the inventory to Knapp — not Aldo — for transportation, source-identified display, promotion, authorized sale, accounting, and return.

112. Knapp nevertheless permitted Aldo to exercise control over Plaintiff's inventory, including deciding which figures would be offered for sale and which would be withheld.

113. Knapp also permitted Aldo, negligently or otherwise, to dismantle completed retail sets into smaller groupings or loose figures and to offer those figures at reduced prices, thereby diminishing the value and intended commercial presentation of Plaintiff's finished goods.

114. The thirty-two completed SS Figure sets originally supplied for the Chicago Show had an anticipated aggregate retail value of approximately $1,279.68, exclusive of additional loose, dismantled, or separately sold SS Figures and other TSC inventory handled at the Show.

115. After the Show, Knapp informed Plaintiff that Aldo had requested and received approximately $640 as a purported commission payment under Plaintiff's thirty-percent commission arrangement with Aldo.

116. Knapp also deducted approximately $210 from the remaining proceeds as reimbursement for his vendor-table fees and expenses.

117. On or around September 30, 2025, after those payments and deductions, Knapp remitted approximately $1,053.50 to Plaintiff, including approximately $235 attributable to non-SS Figure TSC products, and approximately $818.50 attributable to the SS Figures.

118. Knapp further informed Plaintiff that Aldo retained approximately five completed, bagged SS Figure sets after the Show, representing approximately $199.95 in diverted retail value, while returning only loose figures to Knapp.

119. Plaintiff authorized that transaction on September 28, 2025 — *only* on the condition that Aldo pay Plaintiff seventy percent of the price for the "last five sets" upfront.

120. Aldo did not pay Plaintiff for the sets.

121. Knapp did not confirm with Plaintiff whether Aldo had paid Plaintiff for the sets.

122. Knapp, while acting as Plaintiff's bailee and vendor, surrendered control of TSC inventory to Aldo without first obtaining Plaintiff's confirmation.

123. Knapp either (1) negligently failed to protect Plaintiff's property and commercial interests, or (2) knowingly permitted Aldo to exercise unauthorized control over TSC goods, despite lacking authority to do so.

124. Knapp's relinquishment of control materially enabled Aldo to withhold inventory as supposedly "damaged," wrongfully appropriate finished goods, unjustly enrich himself at Plaintiff's expense, and divert Plaintiff's property from its intended commercial purpose.

125. In either event, Knapp materially contributed to the unauthorized retention, dismantling, discounting, diversion, and devaluation of Plaintiff's inventory, including the completed sets retained by Aldo and the loose figures returned to Knapp.

126. Knapp also reported to Plaintiff, both during and after the Chicago Show, that collectors were asking about TSC's figures, reserving sets, and purchasing all non-SS TSC inventory supplied for the show, together with substantial quantities of the SS Figures.

127. Knapp himself repeatedly praised the quality, durability, and commercial appeal of TSC's products as "the best figures out there," both during and after the Chicago Show.

128. As a direct result of Knapp's actions, actual source-origin confusion followed:

**F. Actual Source Confusion Caused by Knapp's Actions ◇**

129. The foremost American toy soldier retailer, *The Hobby Bunker*, (1) purchased SS Figures at the Chicago Show under the mistaken belief that Aldo was their manufacturer; then subsequently (2) advertised them as products of *The Plastic General*; (3) described the goods as originating from a "New 1/32 Scale maker from Canada" using a "proprietary resin blend" that in fact belonged to Plaintiff alone; and (4) omitted *Toy Soldier Central*'s credits.

130. One of *Toy Soldier Central's* principal competitive distinctions was its proprietary flexible-resin formulation: *TSC Bendy-Flex Resin*, developed in collaboration with an overseas chemical laboratory and promoted as a central performance characteristic of TSC products.

131. As a direct result of Knapp's handling of the SS Figures' commercial debut, both the figures and Plaintiff's proprietary resin blend were misattributed to Aldo and *The Plastic General.*

132. When Plaintiff showed him *The Hobby Bunker*'s listing and explained that Aldo was "acting like he's the manufacturer," Knapp agreed that Plaintiff's refinements materially improved the figures and ultimately advised Plaintiff to remove Aldo's name from the figures.

133. Knapp's later recognition of the attribution problem corroborates that the show presentation spread the exact false source identity Plaintiff had already warned him against.

134. The source-origin confusion also persisted among Chicago Show attendees.

135. During the December 9, 2025 episode of Paul Knapp's Podcast, an attendee of the Chicago Show publicly referred to one of Plaintiff's finished models as a *Plastic General* figure until Knapp corrected him by identifying it as "*Toy Soldier Central*'s Waffen SS."

136. Knapp's own correction confirms the existence of actual customer confusion and the falsity of the source presentation he had helped place before the Chicago marketplace.

137. But Knapp had caused that same false narrative to enter commerce through his physical display and sale of Plaintiff's SS Figures under *The Plastic General* branding.

138. Knapp also spread that false narrative further in his *Toy Soldier Tuesday* Podcast.

**G. Knapp's Toy Soldier Tuesday Podcast** ◇

139. Knapp owns, operates, hosts, and exercises primary editorial control over the *Toy Soldier Tuesday* Podcast ("TST Podcast"), a recurring livestream program directed to toy soldier collectors, vendors, retailers, reviewers, customers, and other industry participants.

140. Knapp markets and distributes TST Podcast episodes through YouTube, Facebook, and other online platforms under accounts and channels he controls.

141. Knapp selects and invites guests, determines the subjects discussed, organizes program materials, controls the livestream, questions guests, and decides what content is recorded, edited, titled, described, promoted, published, and preserved after each broadcast.

142. Knapp controls the TST Podcast, and thereby retains authority and responsibility over the continued public availability or removal of the content aired on any specific episode.

**H. Knapp's January 2026 Podcast Episode** ◇

143. On December 10, 2025, at 2:29 PM, after repeated misattribution of the SS Figures to Aldo, and Aldo's continued disregard of multiple notices to cease-and-desist, Plaintiff sought to clear the record publicly before the toy-soldier industry on Knapp's show.

144. The stated purpose of the episode was for Plaintiff to present an orderly, evidence-supported account of the dispute with Aldo and for Plaintiff to issue a final public notice to cease-and-desist directed to Aldo.

145. Knapp, fully aware of Plaintiff's stated purpose, accepted Plaintiff's request to appear, scheduled the January Video, permitted Plaintiff to make the proposed presentation, and exercised control over the resulting TST Podcast program and its subsequent publication.

146. On December 28, 2025, in the days leading up to the January Video, Knapp again suggested that Plaintiff merely purchased existing digital files rather than sculpt his own sets.

147. This caused Plaintiff to doubt the veracity of Knapp's offered sympathies.

148. Plaintiff reiterated that TSC is not merely a "*print house*." *See* § III.D ¶¶ 61–64.

149. Knapp therefore received that correction on at least two separate occasions before publishing his defamatory video concerning Plaintiff in February.

150. **Plaintiff's TST Podcast episode (the "January Video") was broadcast on January 13, 2026, at approximately 8:00 PM;** earlier that afternoon, while preparing the January Video, Knapp informed Plaintiff that he had arranged Plaintiff's nine exhibits "in order," decided that Plaintiff's presentation would proceed last because Knapp believed they would "need a lot more time with [Plaintiff's] issue," and then remarked: "Something tells me I should have a lawyer tonight lol." *See* Exhibit 4.

151. Throughout the January Video, Knapp encouraged Plaintiff's presentation through inquisitorial questioning, allowing Plaintiff to explain his position, identify supporting evidence, and recount the underlying events in detail.

152. Knapp personal engagement with Plaintiff on air involved: (1) asking how the SS Figures moved from digital prototype files to finished physical goods; (2) expressly clarifying

that Aldo supplied renderings rather than finished figures; (3) hearing Plaintiff explain his refinement and production role; and (4) acknowledging that explanation before later helping Aldo broadcast the opposite source-origin narrative in the later video at issue in this action.

153. Upon hearing Plaintiff's presentation and reviewing the supporting evidence, Knapp remarked, "Well, I think that answers the question for most people," and further told Plaintiff, "Hey, you did the best you could," and thanked Plaintiff for appearing and "clearing the air."

154. Knapp then witnessed Plaintiff issue an on-air public cease-and-desist warning to Aldo, demanding the false attribution and related misconduct concerning Plaintiff to cease.

155. Neither Knapp nor any other panel participant challenged Plaintiff as dishonest, or even suggested that Plaintiff's version of events was in any form fabricated or implausible.

156. After the broadcast, Plaintiff and Knapp discussed the episode by text message.

157. During that conversation, Knapp acknowledged Plaintiff's points "needed to be said," and also remarked: "Wait till the Plastic General sees the show." *See* Exhibit 5.

158. Those statements show Knapp understood that Plaintiff's evidence would provoke Aldo and that further public escalation was foreseeable.

159. Despite privately praising Plaintiff's presentation and having personally heard his evidence, Knapp provided Aldo the same TST Podcast platform to present the opposite narrative, repeat the false-attribution claims, and retaliate against Plaintiff with defamation.

**I. Knapp's February 2026 Podcast Episode ◇**

160. Since the Parties became acquainted, Knapp had consistently described Aldo to Plaintiff in disparaging or unfavorable terms.

161. For example, on or about December 31, 2025, Knapp again solicited Plaintiff.

162. While soliciting Plaintiff's commercial collaboration in a Civil War playset, Knapp acknowledged Plaintiff's ownership rights and invoked Aldo as a negative commercial comparator, assuring Plaintiff: "I'm not gonna be like Plastic General" and "Promise this won't turn into a Plastic General senaro *[sic]*."

163. Knapp thereby demonstrated that he understood Aldo's conduct to be improper

164. **Yet between the January Video and the February 2026 TST Podcast, Knapp either solicited Aldo's appearance as a guest or agreed to host him upon Aldo's request.**

165. Knapp informed Plaintiff in advance that Aldo would appear on the TST Podcast.

166. Plaintiff did not object to Aldo appearing.

167. Plaintiff responded cautiously and reminded Knapp that, just as Knapp had asked Plaintiff to remain respectful during his own appearance, Knapp should require the same of Aldo.

168. Plaintiff advised Knapp that he would be watching the broadcast.

169. Plaintiff expressly warned Knapp that Aldo remained free to criticize him, but false statements crossing into slander or tortious interference would result in litigation.

170. On January 15, 2026, Knapp informed Plaintiff that he had spoken with Aldo about the upcoming appearance and represented that Aldo understood the limits of acceptable conduct on Knapp's program. Knapp added he "really don't *[sic]* want to get in the middle of this."

171. Knapp assured Plaintiff: **"[Aldo] knows not to do that especially on my show."**

172. On January 28, 2026, Knapp again confirmed Aldo's upcoming appearance and stated: "Plastic General on [Tuesday] []. I told him to be good lol. I'm sure he'll behave."

173. On February 3, 2026, Knapp hosted Aldo on his TST Podcast[6] ("February Video").

174. Without relitigating *Lisboa v. Aldo*, the February Video contained more than an hour of defamatory statements injurious to Plaintiff's trade and profession.

[6] For the Court's clarity, this is the exact video: https://www.youtube.com/watch?v=j5reXSxjyIE

175. The video also perpetuated the same false Waffen SS Figure source-origin narrative previously challenged by Plaintiff — where Aldo claimed to be the "true maker" and "true brand" of the SS Figures, despite admitting *in the same podcast* that Plaintiff refined, manufactured, and brought the SS Figures to market as tangible goods.

176. Aldo also (1) falsely accused Plaintiff of theft, intellectual-property infringement, and financial dishonesty, including withholding money; (2) falsely portrayed Plaintiff as an incompetent "print house" that failed to properly produce the SS Figures; and (3) admitted he caused *The Hobby Bunker* to remove TSC's attribution and replace it with *The Plastic General.*

177. Knapp was responsible, at least in part, for creating and developing the defamatory content itself.

178. Knapp selected Plaintiff's controversy as the featured subject of the February Video, introduced the segment as an effort to "clear the air" and "put[] this thing to rest," expressly invited Aldo to "give people a little backstory," and affirmatively structured and advanced the resulting presentation.

179. When Aldo framed the dispute as though Plaintiff had wrongfully erased, appropriated, or denied *The Plastic General*'s conceptual contribution, Knapp personally supplied supposed factual corroboration by announcing, "I have the pictures to prove it," asking, "Do you want the video now?," and then supplying and displaying materials intended to substantiate that false framing — even though Knapp already understood and had expressly adopted Plaintiff's distinction between Aldo's credited conceptual role and Plaintiff's production and commercial-source origin role over the finished tangible goods.

180. Knapp continued directing the presentation through Aldo's accusations of intellectual-property theft, financial dishonesty, illegitimate production, and professional

incompetence and, after Aldo completed that account, **expressly adopted and ratified its substance by stating: "Dude, I think you hit the nail right on the head, man."**

181. Knapp publicly adopted Aldo's defamatory narrative, endorsed it as truth, and repeated it on his own broadcast with his "nail right on the head" statement.

182. Knapp thereby materially contributed to the precise false and defamatory implications challenged here, reinforced and normalized them through his express adoption, and then edited, uploaded, published, distributed, and preserved the completed publication.

183. By filming, editing, uploading, and publishing the February Video, Knapp disseminated a false, defamatory narrative portraying Plaintiff as an intellectual-property thief, financially dishonest, and professionally incompetent, and his products as illegitimate.

184. Knapp did so despite the knowledge and warnings previously alleged (*see* § III.C ¶¶ 48–55; § III.H ¶¶ 150–159; see also § III.I ¶¶ 169–172).

**J. Plaintiff's Injuries Resulting from the February Video** ◇

185. Knapp supplied the public vehicle through which Aldo's false-source and defamatory narrative entered and kept circulating within the toy-soldier marketplace (*see* § III.G ¶¶ 139–142; see also § III.I ¶¶ 173–184).

186. The February Video became an immediate and continuing source of downstream defamation and directly and proximately caused source confusion, attribution confusion, false association, marketplace deception, loss of goodwill, reputational injury, customer and retailer confusion, disruption of promotional and affiliate relationships, and impairment of Plaintiff's ability to market and sell the SS Figures.

187. Third parties adopted, repeated, and acted upon the accusations aired through Knapp's platform, causing additional reputational and commercial harm.

188. For example, the February Video poisoned a prospective promotional relationship with the YouTube channel *Toy Soldier Nostalgia*, which maintained approximately 22,300 subscribers and more than 3.5 million views during the relevant period.

189. Knapp's February Video became *Toy Soldier Nostalgia*'s first known exposure to Plaintiff and his business. Following the broadcast, the *Toy Soldier Nostalgia* account publicly stated: "… I'm on team Christian."

190. Accordingly, before Plaintiff could make any direct business approach, Knapp's publication had already exposed *Toy Soldier Nostalgia* to Aldo's false and defamatory account and materially impaired a plausible avenue of affiliate income and promo exposure.

191. On or about June 8, 2026, Jason Lee Gordon ("Gordon") published remarks on a paid-for, market-facing Facebook advertisement for TSC falsely accusing Plaintiff of "stealing from The Plastic General" and stating that TSC was "run by a corrupt thief."

192. On or about June 9, 2026, Gordon published additional remarks on another TSC advertisement, again falsely accusing Plaintiff of "stealing renderings from The Plastic General."

193. Gordon also directed those accusations toward Alan Baker, a potential TSC customer, thereby placing the defamatory narrative directly before a prospective purchaser.

194. Gordon's language repeated the same essential message published through Knapp's February Video: that Plaintiff stole Aldo's intellectual property, that TSC's products were illegitimate, and that Aldo was the true source or owner of the SS Figures.

195. Upon information and belief, based on the timing and near-identical accusations, Gordon encountered that narrative through Aldo's continued repetition, Knapp's still-public February Video, or Knapp's later republication of that video.

196. The Gordon publications demonstrate that Knapp's February Video remained a durable and readily shareable source of downstream defamation long after its original broadcast, enabling third parties to absorb Aldo's accusations, repeat them on Plaintiff's own commercial advertisements, and direct them toward Plaintiff's customers and prospective customers.

197. As a direct and proximate result of Knapp's publication, continued maintenance, and later republication of the February Video, Plaintiff suffered customer hostility, threatened boycotts, actual lost customers, lost or impaired promotional opportunities, interference with prospective customers, damage to TSC's goodwill, and continuing repetition of the false-source narrative throughout the toy-soldier marketplace.

198. A prospective customer expressly traced this reaction directly to Knapp's publication, stating: **"I just saw Paul Knapp's video with the Plastic General about you.** Let me just say you are a *[expletive]*. **I'll tell all the 3D printed mini collectors I know to never buy from you."**

199. That message demonstrates a direct downstream chain of injury — the third party relied on Knapp's February Video, questioned Plaintiff's honesty, and threatened to discourage future purchases from TSC — and was the express reason Plaintiff approached Knapp in earnest to have the February Video privately removed without further drama.

**K. Plaintiff's Private Request For Removal of the February Video** ⏍

200. Knapp initially maintained an ostensibly friendly posture toward Plaintiff.

201. Plaintiff reasonably anticipated that he could inform Knapp of the resulting harm and amicably obtain the removal of the February Video without further fanfare or drama.

202. Plaintiff further anticipated that Knapp, having previously adopted a supposed *"both sides tell their story"* posture, might condition removal of the February Video on simultaneous removal of the January Video and was prepared to accept that concession.

203. By April 2026, Knapp's previously cordial posture had begun to deteriorate.

204. For example, Knapp privately excluded Plaintiff from a Civil War painting contest on logistical grounds, despite publicly advertising the same contest as open to anyone, reinforcing Plaintiff's concern that Knapp had begun acting with actual malice.

205. Regardless, on or about Saturday, June 13, 2026, at approximately 9:38 PM, Plaintiff approached Knapp in good faith seeking a private resolution.

**L. Knapp's Refusal to Remove the February Video After Notice of Actual Harm ⌂**

206. Plaintiff sent Knapp a cordial yet firm Facebook message seeking removal of the February Video because it was producing concrete, ongoing harm to Plaintiff and TSC.

207. Plaintiff did not rely upon speculation and instead supplied Knapp with a direct customer statement expressly tracing accusations against Plaintiff and a threatened boycott to Knapp's video (*see* § III.J ¶¶198–199).

208. Plaintiff explained that viewers were using the episode to falsely accuse him of theft and dishonesty, damage his business reputation, discourage future purchases, and perpetuate the source and attribution confusion at issue here.

209. Knapp nevertheless minimized the injury, asking, "You want me to remove a video cause someone said your *[sic]* a *[expletive]*" and adding, "Hell I get that all the time."

210. Knapp then mischaracterized and falsely reframed Plaintiff's complaint as though Plaintiff had accused Knapp personally, even after Plaintiff clarified.

211. Knapp insisted, "If I remove one video I must remove yours too to make it fair."

212. Plaintiff, having already become familiar with Knapp's shape-shifting principles, responded reasonably and in good faith by accepting simultaneous removal of both videos, stating that if removal of the January Video was necessary to secure removal of the February Video, Knapp should "do what [he] need[ed] to do." Plaintiff thereby prioritized ending the ongoing reputational and commercial harm over preserving his own favorable episode.

213. Knapp also falsely claimed that he did not recall previously advising Plaintiff to remove Aldo's name from the SS Figures, and refused to immediately remove the February Video.

214. Instead, Knapp conditioned removal of the defamatory video upon an unrelated commercial exchange, stating: "Once you receive [the remaining figures] let me know and I will remove both videos from my YouTube channel."

215. Thus, after receiving actual notice, a verbatim example of downstream customer interference, and a renewed request to make the February Video private, Knapp conditioned removal upon receipt of unrelated inventory.

216. Knapp attempted to justify keeping the video online by stating that he had merely allowed Aldo to "[j]ust say his side of the story just like you."

217. Knapp thus continued furnishing Aldo with a public platform after Aldo failed to defend the same accusations in Court, while dismissing Plaintiff's documented evidence that the video was generating ongoing injuries to Plaintiff's business, and Plaintiff's reputation.

218. After Plaintiff issued his request for takedown, Knapp admitted that multiple customers had been "talking [expletive] about [Plaintiff]" at the show and claimed that he had been "constantly backing up [Plaintiff] and [Plaintiff's] figures."

219. Knapp's report of customer disparagement contrasted sharply with the substantial praise he had reported before publishing the February Video

220. Knapp's claimed support for Plaintiff and TSC figures conflicted with his decision to publish and preserve a video perpetuating multiple false and injurious narratives about them.

221. Knapp's admission thereby corroborates that hostility had reached both Plaintiff's commercial reputation and the marketplace perception of his tangible goods.

222. Despite that, Plaintiff affirmed Knapp's "remove both sides" rhetoric, and expressly stated that he wanted the matter resolved "privately and quietly so everyone could move on."

223. Knapp chose otherwise and unnecessarily transformed a discreet request between friends and business associates into an adversarial spectacle through his public conduct:

**M. Knapp's Escalation into Public Spectacle, Source Confusion, and Defamation ◇**

224. First, Knapp kept the harmful publication active while awaiting a tracking event having nothing to do with its truth or falsity, and therefore continued exercising control over a video he had been specifically warned was functioning as an engine of ongoing defamation, source confusion, reputational injury, and interference with Plaintiff's business expectancies.

225. Next, while Knapp actively maintained the February Video's visibility — despite Plaintiff's notice of actual harm and request for removal — Knapp took the parties' otherwise private correspondence and began disseminating the dispute to third parties.

226. For example, on or about June 13, 2026, less than twenty-four hours after receiving Plaintiff's notice concerning the February Video, Knapp deliberately injected the dispute into a public discussion announcing *Mars*'s release of a new SAS desert figure set.

227. Knapp commented: "These look great but I think a saw someone dropped something very similar, ?? LOL" (*"someone,"* as in, Plaintiff.)

228. Knapp's insinuation prompted Martín Córdova — an administrator and curator of large Facebook toy-soldier communities connecting manufacturers directly with collectors

and customers — to respond: "These figures appear to copy specific *Mars* designs rather than freely available 3D models [...] Reproducing them without Sergey Zabashta's permission would be unethical and harmful to both *Mars* and the hobby."

229. Knapp affirmatively encouraged that interpretation, replying: "Martín Córdova totally agree, someone should really do something about it[.]"

230. Córdova had previously supported Plaintiff through private encouragement.

231. Knapp's public insinuations invited him to view Plaintiff as an unethical pirate, copier, or infringer and then expressly endorsed that inference.

232. In doing so, Knapp placed a contrary portrayal of Plaintiff before a prominent community administrator and active business associate whose groups generated revenue and connected Plaintiff with customers, collectors, collaborators, and commercial opportunities.

233. Then, sometime between June 13 and June 14, 2026, Knapp, through one or more private or public oral or written communications, falsely accused Plaintiff of misconduct including, but not limited to, copyright infringement and intellectual-property theft.

234. Knapp's defamatory statements directly precipitated a dispute between Plaintiff and Sergey Zabashta ("Zabashta"), owner of the *Mars* toy soldier company.

235. Zabashta and Plaintiff shared a cordial familiarity before Knapp's involvement.

236. But relying upon the false information supplied by Knapp, Zabashta published a Facebook post accusing Plaintiff of fraud, copyright infringement, and intellectual-property theft.

237. In response to Zabashta's post, Knapp added: "this same individual has been threatening me on messenger and has given me 24 hours to remove one of my YouTube videos I did months ago, because, he said It's hurting his business."

238. Zabashta responded publicly: "Paul Knapp This is interesting. Can you tell me what video you are talking about?"

239. Knapp then replied publicly: "Sergey Zabashta private message sent"

240. Knapp's statement was false and misleading because Plaintiff had not threatened Knapp with unlawful or personal harm.

241. Knapp's infringement accusation lacked any identified factual or evidentiary basis.

242. Knapp identified no protectable element Plaintiff supposedly copied, no evidence that Plaintiff copied any work belonging to *Mars* or Zabashta, and no other facts at all.

243. Material portions of the false narrative Knapp prompted Zabashta to publish were objectively verifiable and demonstrably false.

244. Among other things, Plaintiff had not copied *Mars*'s protected designs, committed fraud or intellectual-property theft, or threatened Knapp with unlawful or personal harm.

245. Knapp invented and circulated a concrete infringement narrative within Plaintiff's commercial community, causing reputational and business harm while neither Knapp nor Zabashta brought an infringement claim or otherwise subjected the accusation to evidentiary testing.

246. Knapp made those false accusations for the purpose of damaging Plaintiff's business, reputation, and standing within the toy-soldier community.

247. The means by which Knapp sought to inflict that harm included turning a private dispute into a public spectacle, fabricating a false copyright-infringement narrative, and mischaracterizing a standard legal cease-and-desist letter as a personal threat.

248. Based on Plaintiff's long-standing familiarity with both Knapp and his online practices, plus Knapp's documented public conduct, Knapp is alleged to have also shared the video additional times both publicly and privately with members of the toy soldier community.

249. Upon information and belief, on or about June 15, 2026, as a direct result of the false infringement narrative Knapp prompted and expressly endorsed, Córdova banned *Toy Soldier Central*™ from a prominent commercial forum.

250. That ban deprived Plaintiff of access to a connecting toy-soldier businesses with customers, collectors, collaborators, and sales opportunities.

251. A number of Plaintiff's customers and affiliates were banned by Córdova and had their comments deleted after they defended the reputations of Plaintiff and his businesses.

252. In the same post, multiple customers declared they would cease buying from TSC.

253. Córdova made a post regarding the TSC ban, and Knapp commented beneath it: "[Toy Soldier Central] Should be banned from all 1/32 groups." *See* Exhibit 6.

254. So after receiving notice that the February Video was causing actual harm, Knapp began affirmatively carrying the private dispute into Plaintiff's commercial community.

255. Knapp's republications and dissemination prompted third parties to discuss Plaintiff as an unethical infringer, falsely portraying Plaintiff's legal notice as a threat, and privately distributing information concerning the very video Plaintiff had asked him to remove.

256. Knapp also republished or affirmatively directed the February Video to Steven Oliver ("Oliver") — one of Plaintiff's most dedicated customers.

257. On or around June 17, 2026, Oliver publicly posted onto Knapp's creator page: "I've just watched Toy Soldier Tuesday, and as suggested, I've looked at the episodes you're going to take offline."

258. Oliver further admitted that he "bought the Waffen SS set because I had seen it on the plastic general."

259. Oliver explained that, after visiting the *Toy Soldier Central*™ website to purchase that set, he bought additional products from Plaintiff and praised TSC's marketing and sets.

260. Thus, Oliver's own statement independently confirms both actual source confusion and a direct commercial relationship with Plaintiff that Knapp placed at risk by directing Oliver to the disputed videos.

261. Knapp then publicly replied: "If it was only that easy. I tried to let both parties say there *[sic]* peace and be done with it but after TSC served The Plastic General with court papers I saw a different side. I will give you more info on a private message"

262. Upon information and belief, Knapp's subsequent escalation was emboldened by his perception that Plaintiff had not yet obtained immediate relief against Aldo.

263. Knapp likewise believed he could antagonize Plaintiff, circulate the challenged accusations, and interfere with Plaintiff's commercial relationships without prompt consequence.

264. Knapp's own statement, coupled with his post-notice republication, customer-directed communications, and continued public escalation, supports a reasonable inference of retaliatory motive, perceived impunity, and conscious disregard of Plaintiff's rights.

265. Upon information and belief, Knapp followed through on his public promise by privately defaming Plaintiff to Oliver, including by republishing or directing Oliver to the February Video and falsely portraying Plaintiff as a copyright infringer or unethical copier.

266. While claiming he merely allowed "both parties" to speak, Knapp continued circulating the videos, injected Plaintiff's lawful service of process into the dispute as though it reflected misconduct, and offered further adverse information privately to one of Plaintiff's own customers — after already having been put on notice by the Plaintiff to cease and desist.

267. Knapp knew Oliver was an existing TSC customer.

268. Knapp thereby used the February Video and related private communications to influence Oliver against Plaintiff.

269. Oliver's own purchasing history had already been affected by the source confusion Knapp helped create.

**N. Knapp's Ongoing Course of Malicious Misconduct and Defiance ⌂**

270. On or about July 13, 2026, despite having participated in or witnessed virtually every material stage of the source-origin dispute concerning the SS Figures at issue here in this controversy, Knapp knowingly and deliberately perpetuated the same false-attribution narrative directly before another one of Plaintiff's customers. *See* Exhibit 7.

271. On the Facebook post of Jay Vinsevich — another dedicated customer of Plaintiff's like Oliver — were published photographs of the current-market version of the SS Figures at issue, and were expressly identified as having come "[f]rom Toy Soldier Central."

272. Knapp nevertheless commented beneath that post and stated: **"Great figures designed by Christian Aldo, The Plastic General!"**

273. Plaintiff and his retained artist designed and developed the finished SS Figures manufactured and sold in commerce. Aldo supplied only rough conceptual prototype files that were not production-ready and could not be used as final commercial models.

274. The original 2025 production files required extensive redesign, reconstruction, replacement geometry, and custom resculpting of Aldo's prototypes before they could be used to manufacture the figures displayed at the Chicago Show.

275. After *Lisboa v. Aldo* was filed, Plaintiff and his retained artist replaced those production files with newly constructed digital files created from the ground up.

276. The earlier versions served only as visual references and were not modified, continued, or incorporated into the replacement files.

277. Aldo did not create, supervise, or contribute digital sculpting or production labor to the replacement files, and did not manufacture or bring the resulting tangible goods to market.

278. Nevertheless, Plaintiff continued, in voluntary good faith, to acknowledge Aldo's earlier conceptual contribution where appropriate.

279. Before making the misattribution alleged herein, Knapp had repeatedly been informed that Aldo supplied only the original concept and prototype materials, while Plaintiff and his retained artist performed the development necessary to create the market-ready figures and Plaintiff manufactured and brought the tangible goods to market.

280. Knapp acknowledged that distinction, agreed that figures made by Plaintiff were Plaintiff's rather than Aldo's, and advised Plaintiff to remove Aldo's name from future figures.

281. Despite that knowledge, Knapp told an actual TSC customer that the finished current-market figures were "designed by Christian Aldo, The Plastic General," falsely attributing to Aldo the design identity of goods created from entirely new files and manufactured and sold by Plaintiff.

282. Knapp's customer-facing statement was knowing and deliberate and was likely to confuse consumers concerning the origin, affiliation, sponsorship, approval, and design identity of the finished SS Figures.

283. Knapp thereby deliberately made false source attributions to Plaintiff's customer, intending to confuse the customer about the figures' true source or defame Plaintiff.

284. Knapp also thereby redirected attribution away from Plaintiff and TSC and toward Aldo on an actual TSC customer's post that displayed the precise SS Figures at issue in this action, notwithstanding the customer's express identification of TSC as their commercial source.

285. Knapp's actions, documented herein, demonstrates ***willful and malicious*** conduct.

286. This post-notice republication further demonstrates that Knapp's conduct was not accidental, neutral, or merely passive, but formed part of a continuing course of deliberate source misattribution directed at Plaintiff and his business.

287. This same post-notice republication further underscores Knapp's continuing negligence, reckless disregard for the truth, and actual malice, which he demonstrated at nearly every opportunity throughout the course of conduct alleged in this Complaint.

288. Knapp further disparaged Plaintiff to Brandon Helms ("Helms"), another industry collaborator with whom Plaintiff and Knapp had previously worked on the Civil War set.

289. Helms is an artist and sculptor who works with various toy soldier companies.

290. Plaintiff reasonably expected that he and Helms would continue collaborating when appropriate — prior to Knapp's interference.

291. On or about July 17, 2026, at approximately 7:46 AM, Helms published an advertisement for a separate collaborative project with Knapp involving a "*Monuments Men*" playset, stating: "30 lbs of parts sent to Paul Knapp for the set. It's gonna be epic."

292. Knapp then commented publicly beneath Helms's advertisement: "Apparently there are haters in the groups thinking this set is AI," followed by: "It's probably Toy Soldier Central."

293. Knapp's statement communicated the specific factual accusation that Plaintiff or *Toy Soldier Central*™ was probably responsible for publicly attacking Knapp's commercial Monuments Men project by claiming that the set was created through artificial intelligence.

294. That accusation was demonstrably false: neither Plaintiff nor *Toy Soldier Central*™ made or disseminated the AI accusation Knapp attributed to them.

295. Knapp made the false accusation directly beneath a market-facing advertisement for a commercial playset he intended to sell for approximately $240 per set, before customers, collectors, collaborators, and competing participants within the same marketplace.

296. In that commercial context, Knapp falsely portrayed Plaintiff and *Toy Soldier Central*™ as dishonest market actors who covertly disparaged, attacked, or attempted to undermine a competitor's commercial product release before an audience of customers.

297. The statement thereby imputed to Plaintiff hostility, dishonesty, commercial sabotage, and a lack of professional integrity in the operation of *Toy Soldier Central*™, directly prejudicing Plaintiff in his trade and profession.

298. Because whether Plaintiff made or circulated the underlying AI accusation is objectively verifiable, Knapp's statement carried a provably false factual connotation.

299. Knapp's accusation also served his own competing commercial interests by defending and promoting his Monuments Men project while falsely shifting responsibility for criticism of that project onto Plaintiff and *Toy Soldier Central*™.

300. Conway Bovell, Michael Bryan, Ray McCarty II and Paul Barbacano responded approvingly to Knapp's remark.

301. McCarty and Barbacano were once supporters of Plaintiff, but ceased collaborating with him on or around June 14, 2026, following Cordova's ban of Plaintiff from the group.

302. Upon information and belief, multiple former customers of *Toy Soldier Central*™, such as Conway Bovell and Michael Bryan, ceased doing business with Plaintiff as a direct or proximate result of Knapp's defamatory, interfering, and source-confusing conduct.

303. Their approving responses to Knapp's later false accusation provide circumstantial support for the alleged impairment of Plaintiff's customer relationships.

304. When Ray McCarty II asked whether Knapp had "secured the rights to use the name," Knapp responded, "yes [] Actually the movie was called THE Monuments Men and we aren't making any figures with the actor's likeness."

305. Knapp's negligent treatment of copyright concerns surrounding his own project emphasizes the actual malice in his willingness to accuse Plaintiff of infringement.

306. Only after Knapp's continuing malice toward Plaintiff did Plaintiff conclude that he had exhausted every reasonable alternative to litigation and had no remaining recourse but to bring Knapp before a tribunal to answer for his conduct.

307. Ultimately, Knapp's professed neutrality was not genuine.

308. At some point during the course of events alleged herein, Knapp abandoned any neutral posture and chose instead to platform Aldo, preserve and circulate Aldo's accusations, and support the resulting narrative against Plaintiff with reckless disregard for its truth or falsity, as demonstrated by the allegations throughout this Complaint.

309. Knapp's repeated assurances, favorable comments, and encouragement induced Plaintiff to prepare supporting materials, appear publicly, submit to Knapp's questioning, and provide his name, image, account, and evidence for publication through Knapp's platform.

310. Plaintiff relied on Knapp's professed neutral purpose in agreeing to that use of his participation and evidentiary presentation.

311. Based upon information and belief — given the extent to which Knapp solicited information and materials from Plaintiff, provided assurances concerning the program, and questioned Plaintiff in preparation for and during Plaintiff's appearance — Knapp engaged in

comparable pre-program coordination with Aldo concerning the subjects, questions, and presentation of Aldo's February appearance.

312. Given Knapp's extensive pre-broadcast coordination of Plaintiff's appearance Knapp likewise coordinated with Aldo in advance concerning the subjects, questions, and presentation of Aldo's account, and likely discussed or otherwise planned to defame Plaintiff.

313. Knapp exercised control over the resulting program, publication, and continued use of Plaintiff's appearance and materials.

314. Knapp's repeated assurances, favorable comments, and encouragement indeed induced Plaintiff to participate in the January Video under the belief that Knapp sought an impartial airing of the dispute.

315. Knapp's subsequent conduct permitted Plaintiff to infer that those assurances were inconsistent with how Knapp ultimately handled the controversy.

316. Had Knapp disclosed that he would pair Plaintiff's appearance with Aldo's opposing narrative and thereafter preserve and circulate the resulting controversy, Plaintiff would not have appeared or supplied his materials upon the same terms.

317. The January Video may not have been the neutral opportunity it appeared to be.

318. Knapp thereby obtained the benefit of Plaintiff's participation and evidentiary presentation while Plaintiff lost control over the use and context of those materials.

319. The remainder of Knapp's conduct exposed his so-called "neutrality."

320. Upon information and belief, Knapp escalated his conduct because he mistakenly believed that Plaintiff's delay in obtaining immediate relief against Aldo, a foreign defendant, demonstrated that similar misconduct could be committed without prompt consequence.

321. Knapp failed to appreciate the material difference between an international defendant located outside the United States and a Virginia resident readily subject to service, personal jurisdiction, discovery, and enforcement within the Commonwealth.

322. Acting under that mistaken sense of impunity, Knapp deliberately antagonized Plaintiff, republished the February Video after notice, injected the private dispute into Plaintiff's commercial community, and continued making false statements to Plaintiff's customers and business associates — as he believed he could do so without meaningful accountability.

323. Knapp's belief that he could injure Plaintiff with impunity, followed by his knowing post-notice escalation, demonstrates spite, retaliatory motive, conscious disregard of Plaintiff's rights and for the truth, and showed actual malice; thus warranting punitive damages.

324. Knapp's intermittent, professed attempts at diplomacy underscore that he was capable of reflecting upon the dispute, appreciating the foreseeable consequences of his conduct, and exercising restraint throughout the relevant period.

325. Knapp's later publication, refusal, republication, and escalation therefore constitute deliberate and informed conduct undertaken with an understanding of the resulting harm.

326. If the causes of action below contain additional factual allegations, those allegations are incorporated into the foregoing factual allegations as though fully set forth therein.

327. Knapp is alleged to have committed the foregoing acts and omissions, which give rise to the following causes of action set forth:

## IV. LEGAL CLAIMS (CAUSES OF ACTION)

At this stage, the Court accepts Plaintiff's well-pleaded factual allegations as true, draws all reasonable inferences in Plaintiff's favor, and construes this *pro se* Complaint liberally.[7]

[7] *See Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 705 (4th Cir. 2016); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

**<u>COUNT I:</u> VIOLATION OF SECTION 43(a)(1)(A) OF THE LANHAM ACT — 15 U.S.C. § 1125(a)(1)(A) — UNFAIR COMPETITION**

**False Association, False Designation of Origin, Reverse Passing Off — *Chicago Show***

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein; and principally incorporates § III.B ¶¶10–35, § III.C ¶¶41–55, § III.E ¶¶81–128, and § III.F ¶¶129–138.

2. Section 43(a)(1)(A) of the Lanham Act prohibits the use in commerce of a false designation, description, or representation likely to cause confusion concerning the source, origin, affiliation, sponsorship, or approval of goods.[8]

3. Reverse passing off occurs where a defendant falsely designates the commercial origin of tangible goods produced by another and thereby causes confusion and commercial injury.

4. A defendant is liable when, in connection with goods, services, or commercial activities, he uses in commerce a false designation of origin or false or misleading description or representation of fact that is likely to cause confusion or mistake concerning affiliation, connection, association, origin, sponsorship, or approval.

5. Intent is not required for basic relief, but it is relevant for enhanced damages.

6. A reverse-passing-off claim requires that (1) the tangible goods at issue originated with Plaintiff as their producer; (2) Defendant falsely designated the origin of those goods; (3) the false designation was likely to cause consumer confusion; and (4) Plaintiff was harmed by the false designation.

---

[8] *See* 15 U.S.C. § 1125(a)(1)(A); *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 710–12 (4th Cir. 2016); *Universal Furniture International, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1, 31–32 (2003); *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–34 (2014); *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212 (2020).

7. Plaintiff must further allege injury to a commercial interest in reputation or sales that falls within the Lanham Act's protected zone of interests and was approximately caused by the challenged deception.

8. As alleged in § III.C ¶¶ 41–55 and § III.E ¶¶ 82–97, Plaintiff and Toy Soldier Central ™ directed, financed, developed, physically manufactured, commercially prepared, and supplied the completed SS Figures, and Knapp knew Plaintiff and TSC were the production and commercial sources of the SS Figures at issue in this controversy.

9. As alleged in § III.E ¶¶ 96–104, Knapp controlled the vendor presentation and displayed, permitted, or failed to prevent the completed SS Figures from being offered on anything other than the authorized *Toy Soldier Central*™ displays.

10. That confused presentation displaced Plaintiff's source identity at the point of sale and represented a competing commercial designation as the principal source, manufacturer, product line, or controlling brand of Plaintiff's finished tangible goods.

11. The same conduct constituted reverse passing off because the completed tangible goods originated with Plaintiff, Knapp offered and sold them through a compensated vendor operation and display he controlled, and the presentation identified *The Plastic General* rather than Plaintiff and *Toy Soldier Central*™ as their commercial origin.

12. As alleged in § III.F ¶¶ 129–138, actual confusion followed.

13. The Illinois trade-show sales, interstate product movement, nationally accessible retail listing, and resulting injury to Plaintiff's sales, source identity, goodwill, customer recognition, and reputation satisfy the interstate-commerce, protected-interest, and proximate causation requirements. *See* § III.B ¶¶ 10–35; § III.E ¶¶ 81–128; § III.F ¶¶ 129–138.

14. The foregoing allegations plausibly state a claim for false association, false designation of origin, reverse passing off, and unfair competition under 15 U.S.C. § 1125(a)(1)(A).

15. Plaintiff seeks the legal and equitable relief requested for Count I in the Prayer for Relief.

## COUNT II: VIOLATION OF SECTION 43(a)(1)(A) OF THE LANHAM ACT — 15 U.S.C. § 1125(a)(1)(A) — UNFAIR COMPETITION

### False Association and False Designation of Origin — *The February Video*

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.B ¶¶ 10–35, § III.C ¶¶ 48–55, § III.G ¶¶ 139–142, § III.H ¶¶ 143–159, § III.I ¶¶ 160–184, § III.J ¶¶ 185–199, § III.L ¶¶ 206–223, § III.M ¶¶ 224–269, and § III.N ¶¶ 270–327.

2. The governing standards under 15 U.S.C. § 1125(a)(1)(A) are set forth in § IV, Count I ¶¶ 2–7 and incorporated here.

3. This Count applies those standards to the source-identifying representations Knapp filmed, edited, uploaded, published, distributed, maintained, and later republished through his February Video.

4. As alleged in § III.G ¶¶ 139–142 and § III.I ¶¶ 164–184, Knapp controlled the Toy Soldier Tuesday Podcast in its entirety.

5. Knapp used his nationally accessible, market-facing platform to distribute representations concerning the precise goods manufactured and sold by Plaintiff.

6. The February Video represented Aldo and The Plastic General as the "true maker" and "true brand" of the SS Figures, portrayed Plaintiff as an unauthorized or illegitimate producer, and communicated that TPG controlled, sponsored, approved, or constituted the authentic commercial source of the finished goods. *See* § III.I ¶¶ 175–184.

7. Those representations were false and misleading, as Plaintiff was the producer and manufacturer of the finished tangible goods. *See* § III.C ¶¶ 41–55.

8. Knapp published the false narrative and contributed to the source origin confusion despite having (1) agreed that figures made by TSC were Plaintiff's; (2) advised Plaintiff to remove Aldo's name; (3) corrected prior actual source confusion; (4) heard and praised Plaintiff's January presentation; (5) witnessed Plaintiff's cease-and-desist demand; and (6) warned Aldo about the limits of acceptable conduct on Knapp's program. *See* § III.C ¶¶ 48–55; § III.F ¶¶ 132–138; § III.H ¶¶ 151–159; § III.I ¶¶ 164–172.

9. The allegations further establish actual or likely confusion and commercial injury.

10. Viewers repeated the competing Plastic General attribution, a prospective purchaser expressly identified Knapp's publication before questioning Plaintiff's honesty and threatening a boycott, and Toy Soldier Nostalgia aligned against Plaintiff following its first known exposure through the February Video. *See* § III.J ¶¶185–199; § III.M ¶¶256–269.

11. Accordingly, the foregoing allegations plausibly state a claim for false association, false designation of origin, and unfair competition under 15 U.S.C. § 1125(a)(1)(A), and Plaintiff seeks the legal and equitable relief identified for Count II in the Prayer for Relief.

## <u>COUNT III:</u> VIOLATION OF SECTION 43(a)(1)(B) OF THE LANHAM ACT — 15 U.S.C. § 1125(a)(1)(B) — UNFAIR COMPETITION

### False Advertising and Commercial Promotion — *The February Video*

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.B ¶¶ 10–35, § III.C ¶¶ 48–55, § III.D ¶¶ 56–80, § III.E ¶¶ 94–128, § III.F ¶¶ 129–138, § III.G ¶¶ 139–142, § III.H ¶¶ 143–159, § III.I ¶¶ 160–184, § III.J ¶¶ 185–199, and § III.N ¶¶ 270–327.

2. Section 43(a)(1)(B) of the Lanham Act prohibits false or misleading factual representations made in commercial advertising or promotion concerning the nature, characteristics, qualities, or commercial activities of a person or his goods.

3. The representation must be material, deceptive or likely to deceive, placed in interstate commerce, and likely to cause diverted sales or diminished goodwill.[9]

4. False advertising specifically requires that (1) Defendant made a false or misleading description or representation of fact in commercial advertising or promotion concerning his own or another person's goods, services, or commercial activities; (2) the representation was material because it was likely to influence a purchasing decision; (3) the representation actually deceived or had the tendency to deceive a substantial segment of its audience; (4) Defendant placed the representation in interstate commerce; and (5) Plaintiff was injured or likely to be injured through the direct diversion of sales or the lessening of goodwill associated with his products.

5. The challenged representation must be a specific and measurable factual claim capable of objective proof or disproof, rather than nonverifiable opinion or puffery.

6. The challenged factual representations included that: (1) Aldo and *The Plastic General* were the "true maker" and "true brand" of the SS Figures; (2) Plaintiff stole or otherwise infringed Aldo's intellectual property and lacked authority to produce the goods; (3) Plaintiff wrongfully withheld money; (4) Plaintiff was merely an incompetent "print house"; (5) Plaintiff's manufacturing produced broken, fragile, incomplete, or defective figures, including allegedly uncorrected gun tips; (6) Plaintiff performed only "slight tweaks"

[9] 15 U.S.C. § 1125(a)(1)(B); *Design Resources, Inc. v. Leather Industries of America*, 789 F.3d 495, 501–02 (4th Cir. 2015); *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120–22 (4th Cir. 2011); *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 298–99 (4th Cir. 2017); *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 272–73 (4th Cir. 2002).

to files supposedly already "96% done" and introduced inaccurate "ruffling" into the coats; and (7) Aldo had put *Toy Soldier Central*™ "on the map."

7. Those were specific, objectively verifiable factual representations concerning authorization, commercial source, manufacturing competence, product durability, design labor, historical accuracy, financial integrity, trade-secrets, and *Toy Soldier Central*'s preexisting commercial standing, rather than nonverifiable opinion or puffery.

8. The representations were false and/or misleading.

9. Plaintiff was authorized to refine and commercialize the prototype materials; the prototypes required extensive redevelopment; Plaintiff and his retained, in-house artist created the production-grade designs; Plaintiff physically manufactured and commercially prepared the finished goods; and TSC had achieved independent sales, recognition, publication, affiliate income, and industry visibility before Aldo's involvement (*see* § III.B ¶¶ 10–35; § III.C ¶¶ 41–55; § III.E ¶¶ 94–95; § III.N ¶¶ 273–277).

10. The false narrative's perpetuation created a two-sided product deception.

11. The marketplace attributed Plaintiff's proprietary flexible-resin advantage to *The Plastic General* while Knapp, through his February Video, helped attribute supposed brittleness, breakage, deformation, and manufacturing failure to Plaintiff and *Toy Soldier Central*™. *See* § III.F ¶¶ 129–133; § III.I ¶¶ 175–183.

12. The February Video constituted commercial promotion within the relevant niche market because Knapp was a reviewer, affiliate, compensated vendor, media operator, and former commercial representative of Plaintiff; he directed the program to collectors, customers, retailers, vendors, reviewers, and affiliates; he promoted *The Plastic General* as the authentic brand and commercial source of the disputed product line; and he discredited

*Toy Soldier Central*™'s competing goods, manufacturing competence, and commercial legitimacy. *See* § III.D ¶¶ 56–80; § III.G ¶¶ 139–142; see also § III.I ¶¶ 173–184.

13. The TST Podcast functions as a hybrid industry talk-and-sales program through which manufacturers, vendors, reviewers, and collectors displayed products, discussed recent and forthcoming releases, recommended purchases, promoted commercial brands, and influenced purchasing decisions within the concentrated toy-soldier market.

14. The February Video itself functioned as commercial promotion because Aldo used the program to identify *The Plastic General* as the "true brand" and commercial source of the SS Figures, promote the commercial value and future expansion of that competing brand, announce his intention to manufacture and sell additional toy-soldier lines, and disparage the legitimacy, quality, authorization, and commercial integrity of TSC's competing products.

15. The representations were material and deceptive because authorization, source, durability, manufacturing competence, product quality, and seller honesty directly influence whether purchasers buy, retailers stock, reviewers recommend, and affiliates promote a manufacturer's goods.

16. Those representations were also commercially material because flexibility, durability, and resistance to breakage were central features through which TSC differentiated its resin figures and generated customer goodwill, via *TSC Bendy-Flex* branded resin.

17. Aldo represented the figures as unintentionally warped, structurally defective, fragile, or prone to failure, when the TSC Formulation was deliberately engineered to bend without breaking.

18. A prospective purchaser expressly identified Knapp's video before threatening a boycott, and Toy Soldier Nostalgia publicly aligned against Plaintiff following its first known exposure through the publication. *See* § III.J ¶¶ 185–199.

19. Knapp distributed the challenged representations through nationally accessible platforms to a multistate and international market concerning goods manufactured in Virginia and sold in interstate commerce.

20. The publication directly threatened sales, diminished goodwill, disrupted promotional opportunities, and impaired Plaintiff's ability to market the SS Figures and related *Toy Soldier Central*™ products.

21. Knapp acted knowingly and willfully because he published the challenged representations after learning Plaintiff's true production role, agreeing that figures made by Plaintiff were Plaintiff's, correcting prior source confusion, hearing Plaintiff's January presentation, witnessing the cease-and-desist demand, and warning Aldo concerning his conduct.

22. He thereafter maintained and republished the Video after receiving a customer statement directly tracing a threatened boycott to that publication (*see* § III.A ¶¶ 8–9; § III.C ¶¶ 48–55; § III.H ¶¶ 153–159; see also § III.I ¶¶ 169–184; § III.J ¶¶ 198–199; § III.L ¶¶ 206–223; § III.M ¶¶ 224–269).

23. Accordingly, the foregoing allegations plausibly state a claim for false advertising and commercial promotion under 15 U.S.C. § 1125(a)(1)(B), and Plaintiff seeks the legal and equitable relief identified for Count III in the Prayer for Relief.

## <u>COUNT IV:</u> VIOLATION OF SECTION 43(a)(1)(A) OF THE LANHAM ACT — 15 U.S.C. § 1125(a)(1)(A) — UNFAIR COMPETITION

### False Association and False Designation of Origin — *Direct Customer Misattribution*

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.C ¶¶ 48–55, § III.F ¶¶ 129–138, § III.H ¶¶ 153–159, § III.M ¶¶ 256–269, and § III.N ¶¶ 270–287.

2. The governing standards under 15 U.S.C. § 1125(a)(1)(A) are stated in Count I and incorporated here.

3. This Count addresses specific customer-facing instances in which Knapp caused, materially contributed to, or directly communicated the attribution of Plaintiff's finished tangible goods to Aldo and *The Plastic General.*

4. A minimum of three incidents demonstrate actual source confusion.

5. The Hobby Bunker purchased and advertised the SS Figures under the mistaken belief that Aldo manufactured them; a Chicago Show attendee publicly identified one of Plaintiff's finished models as a Plastic General figure until Knapp corrected him; and Steven Oliver stated that he purchased the Waffen-SS set because he had seen it attributed to The Plastic General. *See* § III.F ¶¶ 129–138; *see also* § III.M ¶¶ 256–260.

6. Knapp materially contributed to the confusion affecting Oliver by (1) helping introduce the *Plastic General* source presentation at Chicago; (2) publishing and maintaining the same source narrative through the February Video; (3) suggesting that Oliver review the disputed episodes; (4) and offering Oliver additional private information; (5) despite knowing Oliver was an existing Toy Soldier Central™ customer the entire time (*see* § III.E ¶¶ 96–104; *see also* § III.F ¶¶ 129–138; § III.I ¶¶ 173–184; § III.M ¶¶ 256–269).

7. The Vinsevich incident also constituted one of Knapp's separate, direct customer-facing false attributions.

8. Vinsevich displayed the current-market SS Figures and expressly identified them as coming "[f]rom Toy Soldier Central." Knapp nevertheless commented: "Great figures designed by Christian Aldo, The Plastic General!" *See* § III.N ¶¶270–272.

9. The current-market SS Figure goods were manufactured from newly constructed digital files created from the ground up by Plaintiff and his retained artist, using the earlier versions only as visual references.

10. Aldo did not create, supervise, or contribute sculpting or production labor to those replacement files and did not manufacture or bring the resulting goods to market. *See* § III.N ¶¶ 273–277.

11. By pairing Aldo's name with the commercial designation "*The Plastic General*" directly beneath an existing customer's product post, Knapp redirected the design and marketplace identity of the finished goods away from Plaintiff and *Toy Soldier Central*™ and toward another industry source in a context concerning source, affiliation, sponsorship, approval, and commercial identity.

12. Knapp knew the statement was false or misleading because he had received Plaintiff's explanation, agreed that figures made by Plaintiff were Plaintiff's, advised Plaintiff to remove Aldo's name, corrected prior source confusion, heard Plaintiff's evidence, and received actual notice that the contrary narrative was generating accusations of theft and threatened boycotts (*see* § III.C ¶¶ 48–55; § III.F ¶¶ 132–138; § III.H ¶¶ 153–159; § III.L ¶¶ 206–223; § III.N ¶¶ 279–287).

13. The incidents involved identical or directly related goods, overlapping physical and online marketing channels, the same concentrated niche audience, Knapp's apparent firsthand source knowledge, and multiple instances of actual confusion affecting retailer listings, customer understanding, purchasing conduct, goodwill, and customer relationships.

14. The foregoing allegations plausibly state a claim for false association, false designation of origin, and unfair competition under 15 U.S.C. § 1125(a)(1)(A), and Plaintiff seeks the legal and equitable relief identified for Count IV in the Prayer for Relief.

## COUNT V: DEFAMATION *PER SE*

### Virginia Common Law — *Initial Publication of the February Video*

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.C ¶¶ 48–55, § III.G ¶¶ 139–142, § III.H ¶¶ 143–159, § III.I ¶¶ 160–184, § III.J ¶¶ 185–199, § III.L ¶¶ 206–223, § III.M ¶¶ 224–269, and § III.N ¶¶ 270–327.

2. Under Virginia common law, defamation requires (1) publication, (2) of an actionable statement concerning Plaintiff, and (3) the requisite intent.

3. A statement is defamatory *per se* when it (1) imputes the commission of a crime involving moral turpitude; (2) imputes unfitness to perform the duties of a job or a lack of integrity in performing those duties; (3) prejudices a person in his profession or trade; or (4) imputes the existence of a contagious disease.[10]

4. Where defamation *per se* is established, general damages are presumed and Plaintiff need not prove special or pecuniary loss.

5. As alleged in § III.G ¶¶ 139–142 and § III.I ¶¶ 164–184, Knapp selected or accepted Aldo as the featured guest, selected the controversy as the episode's subject, controlled the questioning and presentation, filmed and edited the program, and uploaded,

[10] *Schaecher v. Bouffault*, 290 Va. 83, 91–93 (2015); *Tronfeld v. Nationwide Mutual Insurance Co.*, 272 Va. 709, 713–15 (2006); *Fleming v. Moore*, 221 Va. 884, 889 (1981); *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 146–48 (1985); *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7 (1954).

published, marketed, distributed, and preserved the finished February Video to collectors, customers, retailers, reviewers, affiliates, vendors, and other industry participants.

6. Plaintiff is the person whose honesty, competence, commercial conduct, intellectual property practices, and role over the SS Figures were prejudiced in Knapp's February Video.

7. It identified Plaintiff and *Toy Soldier Central*™ by name, discussed the SS Figures manufactured and sold by Plaintiff, addressed Plaintiff's dispute with Aldo, and accused the person operating TSC of theft, intellectual-property infringement, illegitimate commercialization, financial dishonesty, withholding money, and professional incompetence.

8. A prospective customer understood the publication to concern Plaintiff, stating: "I just saw Paul Knapp's video with the Plastic General about you." *See* § III.J ¶¶ 198–199.

9. Knapp republished — and expressly adopted as his own — a false narrative conveying that Plaintiff stole or exploited another creator's intellectual property, falsely held himself out as the legitimate producer, wrongfully retained or refused to pay money, and lacked the honesty and trade competence required to operate TSC. *See* § III.I ¶¶ 164–184.

10. Those republications stated or implied objectively verifiable facts.

11. Whether Plaintiff possessed authorization, took another person's property, withheld money, manufactured the figures, repaired the underlying designs, or competently performed the production work is capable of proof or disproof.

12. The accusations are false — and were false under the incorporated allegations. *See* § III.B ¶¶ 10–35; § III.C ¶¶ 41–55; § III.E ¶¶ 94–128.

13. Because the published statements imputed criminal behavior and attacked Plaintiff's professional competence and integrity within his trade, they constitute defamation *per se*.

14. At minimum, Knapp acted negligently by publishing the accusations despite his direct knowledge of the production history, prior adoption of Plaintiff's source position, correction of actual confusion, firsthand exposure to Plaintiff's evidence, and advance recognition that Aldo required warning and supervision. *See* § III.C ¶¶ 48–55; § III.F ¶¶ 132–138; § III.H ¶¶ 151–159; § III.I ¶¶ 164–172.

15. Those same prepublication facts, together with Knapp's later refusal, post-notice republication, customer-directed dissemination, exclusionary campaign, direct customer-facing misattribution, and separate false accusation beneath the advertisement for his own competing $240 commercial playset **support a reasonable inference of spite, retaliatory and commercial motive, and conscious disregard of Plaintiff's rights and for the truth, thereby supporting actual malice and punitive damages** (*see* § III.L ¶¶ 206–223; § III.M ¶¶ 224–269; § III.N ¶¶ 270–327).

16. Knapp materially contributed to the creation and development of the February Video by (1) selecting or accepting Aldo as the featured guest; (2) choosing the controversy as the episode's subject; (3) controlling the questioning; (4) presentation; (5) filming; and editing of the program; (6) participating in the on-air development of Aldo's accusations; (7) uploading the completed publication; (8) maintaining that benefit for commercial profit; and (9) later affirmatively redistributing the Video after receiving explicit notice that it was causing actual reputational and commercial harm to Plaintiff. *See* § III.A ¶¶ 8–9; § III.G ¶¶ 139–142; § III.I ¶¶ 164, 173, 177–184; § III.J ¶¶ 198–199; § III.L ¶¶ 206–215; § III.M ¶¶ 248, 256–269.

17. Knapp was therefore responsible, at least in part, for creating and developing the defamatory content itself. *See* § III.I ¶¶ 164–184.

18. Knapp thereby transformed Plaintiff's legitimate claim to the commercial origin of goods he produced into a defamatory narrative that Plaintiff had stolen, falsely claimed, or otherwise infringed upon another person's creative work or intellectual-property.

19. Knapp directed and advanced Aldo's presentation during the live broadcast.

20. After Aldo completed his defamatory account, Knapp expressly adopted and ratified its substance by stating, "Dude, I think you hit the nail right on the head, man," and later personally repeated its central false-source premise to Vinsevich.

21. Knapp's own factual corroboration, development of the defamatory framing, express on-air ratification, and subsequent personal repetition made him responsible, in whole or in part, for creating and developing the precise defamatory implications challenged herein (*see* § III.C ¶¶48–55; § III.G ¶¶139–142; § III.I ¶¶177–184; § III.N ¶¶270–287).

22. Knapp separately adopted and personally repeated Aldo's defamatory narrative in his own words when, after receiving actual notice of the Video's harmful meaning and despite his prior contrary admissions, he told Vinsevich that the current-market figures were "designed by Christian Aldo, The Plastic General," thereby reinforcing the false implication that Plaintiff had claimed, copied, or illegitimately commercialized Aldo's work.

23. Because that statement was authored and communicated by Knapp himself, it was Knapp's own defamatory content rather than information supplied solely by Aldo. *See* § III.C ¶¶ 48–55; § III.L ¶¶ 206–223; § III.N ¶¶ 270–287.

24. The publication caused both presumed and actual injury, including reputational damage, customer hostility, a threatened boycott expressly traced to Knapp's video, impaired affiliate and promotional opportunities, diminished goodwill, and continuing repetition and

reinforcement of the theft and false-source narrative (*see* § III.J ¶¶ 185–199; § III.M ¶¶ 224–269; § III.N ¶¶ 270–287).

25. Accordingly, the foregoing allegations plausibly state a claim for defamation per se arising from Knapp's initial publication of the February Video, and Plaintiff seeks the legal relief identified for Count V in the Prayer for Relief.

## COUNT VI: DEFAMATION *PER SE*

### Virginia Common Law — *Later Republication(s) of the February Video*

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.A ¶¶ 8–9, § III.I ¶¶ 173–184, § III.J ¶¶ 185–199, § III.L ¶¶ 206–223, § III.M ¶¶ 224–269, and § III.N ¶¶ 270–327.

2. The governing standards for defamation and defamation *per se* are stated in Count V and incorporated here.

3. This Count rests upon new affirmative acts through which Knapp allegedly reshared, directed, transmitted, promoted, or otherwise supplied the February Video and its defamatory narrative to additional recipients. *See* § III.A ¶¶ 8–9; § III.M ¶¶ 248–269.

4. After receiving notice of a customer accusation and threatened boycott expressly traced to the February Video, Knapp continued disseminating the defamatory narrative into Plaintiff's commercial community, directed or suggested that customers review the episodes, and publicly promised to provide them further information privately. *See* § III.L ¶¶ 206–223; § III.M ¶¶ 256–266.

5. Upon information and belief, Knapp followed through by privately directing Oliver to the February Video, retransmitting its defamatory narrative, or otherwise portraying Plaintiff as a copyright infringer or unethical copier. *See* § III.M ¶¶ 256–269.

6. Each affirmative republication carried the same defamatory meanings identified in Count V, including intellectual-property theft, illegitimate production, financial dishonesty, and professional incompetence.

7. Because those representations imputed criminal behavior and attacked Plaintiff's professional competence and integrity within his trade, they constitute defamation *per se*, and general damages are presumed without proof of special pecuniary loss.

8. Knapp's actual notice, prior contrary admissions, targeted customer communications, renewed promotion of the publication, promise to provide private adverse information, continued post-notice escalation, and later direct false accusation against *Toy Soldier Central*™ beneath the advertisement for his own competing commercial product support a reasonable inference of spite, retaliatory and commercial motive, and conscious disregard of Plaintiff's rights and for the truth, thereby supporting actual malice and punitive damages (*see* § III.L ¶¶ 206–223; § III.M ¶¶ 224–269; § III.N ¶¶ 270–327).

9. The republications caused or prolonged customer hostility, threatened boycotts, impairment of commercial relationships, repeated theft accusations, source confusion, diminished goodwill, and reputational injury within Plaintiff's niche marketplace (*see* § III.J ¶¶185–199; § III.M ¶¶249–269).

10. Knapp republished or otherwise disseminated the February Video multiple times.

11. Accordingly, the foregoing allegations plausibly state a claim for defamation per se arising from Knapp's affirmative later republications and targeted dissemination, and Plaintiff seeks the legal relief identified for Count VI in the Prayer for Relief.

## COUNT VII: DEFAMATION PER SE

**Virginia Common Law — *Knapp's July 17, 2026 Direct Commercial Publication***

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and specifically incorporates § III.B ¶¶ 10–35, § III.L ¶¶ 206–223, § III.M ¶¶ 224–269, and § III.N ¶¶ 288–327.

2. The governing standards for defamation and defamation *per se* are stated in Count V ¶¶ 2–4 and incorporated here.

3. On or about July 17, 2026, beneath Helms's market-facing advertisement for Knapp's competing Monuments Men playset, Knapp published, "Apparently there are haters in the groups thinking this set is AI," and then specifically identified Plaintiff's business as the probable source by stating, "It's probably Toy Soldier Central" (*see* § III.N ¶¶291–299).

4. The publication was of and concerning Plaintiff (*see* § III.N ¶¶ 292–299).

5. *Toy Soldier Central*™ is one of Plaintiff's captioned registered trade names, Plaintiff is its sole owner and operator, and Knapp expressly identified that business before customers and collaborators in the same concentrated toy-soldier marketplace (*see* § I ¶ ii; § III.B ¶ 10; § III.N ¶¶ 288–300).

6. In the context of Helms's commercial advertisement and Knapp's immediately preceding reference to supposed "haters," the statement communicated the specific factual accusation that Plaintiff or *Toy Soldier Central*™ was "probably" responsible for covertly attacking Knapp and Helm's competing commercial product by falsely representing that it had been created through artificial intelligence (*see* § III.N ¶¶291–299).

7. Knapp's use of the word "probably" did not convert that accusation into nonactionable opinion or rhetorical hyperbole.

8. In the military miniatures niche and other artist-driven markets, the use of AI — or an accusation of such use — is inherently prejudicial to one's trade and reputation.

9. Whether Plaintiff or *Toy Soldier Central*™ made or disseminated the underlying AI accusation is objectively verifiable, and Knapp's statement implied that he possessed a factual basis for attributing that conduct to Plaintiff (*see* § III.N ¶ 298).

10. The accusation was false.

11. Neither Plaintiff nor *Toy Soldier Central*™ made, circulated, or caused the AI accusation Knapp attributed to them (*see* § III.N ¶ 294).

12. The accusation prejudiced Plaintiff in his trade and profession because it portrayed him, in the operation of *Toy Soldier Central*™, as a dishonest market actor who covertly disparaged and attempted to sabotage a competitor's commercial product.

13. The accusation directly implicated the honesty, integrity, and fair dealing required of Plaintiff as a toy-soldier designer, manufacturer, seller, and industry collaborator and therefore constituted defamation *per se* (*see* § III.N ¶¶ 294–299).

14. At minimum, Knapp acted negligently by publishing the accusation without identifying any supporting fact, source, statement, or other evidentiary basis.

15. The pleaded circumstances further support the reasonable inference that Knapp knew the accusation was false or acted with reckless disregard for whether it was true.

16. Knapp published the accusation after receiving actual notice that his prior publication and related conduct were harming Plaintiff, after carrying the parties' private dispute into Plaintiff's commercial community, and while defending and promoting his own competing playset priced at approximately $240 per set (*see* § III.L ¶¶ 206–223; § III.M ¶¶ 224–269; § III.N ¶¶ 288–327).

17. That post-notice timing, retaliatory course of conduct, absence of factual basis, and direct competing commercial interest support a reasonable inference of spite, ill will,

commercial motive, and conscious disregard of Plaintiff's rights and for the truth, thereby supporting actual malice and punitive damages (*see* § III.L ¶¶ 206–223; § III.M ¶¶ 224–269; § III.N ¶¶ 288–327).

18. Because the publication constituted defamation *per se*, general damages are presumed without proof of special pecuniary loss.

19. The statement exposed Plaintiff to further reputational prejudice before Helms, customers, collaborators, and competing industry participants, and Plaintiff seeks any additional actual commercial loss attributable to this republication (*see* § III.N ¶¶288–303).

20. Accordingly, the foregoing allegations plausibly state a claim for defamation *per se* arising from Knapp's July 17, 2026 direct commercial publication, and Plaintiff seeks the legal relief identified for Count VII in the Prayer for Relief.

## COUNT VIII: TORTIOUS INTERFERENCE

**Virginia Common Law — *Knapp's Sustained Course of Interfering Conduct***

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.B ¶¶ 28–35, § III.D ¶¶ 56–80, § III.J ¶¶ 185–199, § III.M ¶¶ 224–269, and § III.N ¶¶ 288–327.

2. Under Virginia common law, tortious interference with an at-will or prospective business relationship requires (1) a valid business relationship or expectancy carrying a reasonable probability of future economic benefit; (2) Defendant's knowledge of that relationship or expectancy; (3) Defendant's intentional interference through improper methods; (4) reasonable certainty that, absent Defendant's interference, the relationship would have continued or the expectancy would have been realized; and (5) resulting damage to Plaintiff.

3. Improper methods include — but are not limited to — conduct that is illegal, independently tortious, fraudulent, defamatory, misrepresenting, misleading, deceitful, unfairly competitive, or contrary to an established standard of trade or profession.[11]

4. Plaintiff maintained existing customer, affiliate, collaborator, and marketplace relationships that generated sales, promotional exposure, and approximately $1,000 per month in affiliate-related profit. *See* § III.B ¶¶ 28–35.

5. The specific relationships and expectancies impaired by Knapp included, but were not limited to: (1) Plaintiff's continuing commercial access to customers, affiliates, and collaborators through Córdova's Facebook groups; (2) Plaintiff's customer relationships, such as with Steven Oliver, Conway Bovell and Michael Bryan; (3) Plaintiff's continuing or prospective collaborative relationship with Helms; and (4) Plaintiff's opportunity to sell at the Chicago Show hosted by T*he Hobby Bunker* (*see* § III.M ¶¶224–269; § III.N ¶¶288–303).

6. Knapp knew of those relationships and their commercial value.

7. Knapp had acted as Plaintiff's reviewer, brand representative, compensated vendor, salesperson, inventory custodian, and commercial associate; knew the groups connected businesses directly with customers; knew Oliver was an existing *Toy Soldier Central*™ customer; and had personally collaborated with Plaintiff and Helms on the Civil War project (*see* § III.D ¶¶56–80; § III.M ¶¶228–232, 256–269; § III.N ¶¶288–291).

8. Knapp intentionally interfered through improper methods by prompting and endorsing false infringement accusations, transmitting the dispute to commercial contacts, characterizing Plaintiff's legal notice as a threat, advocating that *Toy Soldier Central*™ be

[11] *See Preferred Systems Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 403–04 (2012); *Commercial Business Systems, Inc. v. Halifax Corp.*, 253 Va. 292, 300–03 (1997); *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 558–60 (2011); *Duggin v. Adams*, 234 Va. 221, 226–28 (1987).

banned from all 1/32-scale toy-soldier groups, directing an existing customer to the disputed videos, promising private adverse information, and publicly disparaging Plaintiff beneath another collaborator's commercial advertisement for Knapp's own competing product (*see* § III.M ¶¶ 224–269; § III.N ¶¶ 288–299).

9. The relationships carried a reasonable probability of continued economic benefit.

10. Córdova had previously supported Plaintiff; Plaintiff's participation in the groups generated revenue and commercial opportunities; Oliver was an active purchasing customer; Plaintiff and Helms had previously collaborated; and Bovell and Bryan were existing customers before the alleged interference.

11. The disruption immediately followed the interference: Córdova banned *Toy Soldier Central* ™, banned supporters defending Plaintiff, customers announced that they would cease purchasing, and Conway Bovell and Michael Bryan ceased doing business with Plaintiff following Knapp's interference. *See* § III.M ¶¶ 249–253; § III.N ¶¶ 300–303.

12. Knapp's use of defamatory accusations, false source representations, mischaracterization, unfair competition, and customer-directed dissemination constituted independently tortious and otherwise improper methods.

13. Knapp's post-notice timing, public ban advocacy, promise to provide adverse information privately, targeting of known customers and collaborators, and later false accusation beneath Helms's commercial advertisement support intentional interference.

14. Knapp's post-notice decisions demonstrated spite, retaliatory and commercial motive, plus conscious disregard of Plaintiff's rights, thereby warranting punitive damages.

15. As a direct and proximate result, Plaintiff lost access to a commercially significant forum, lost or impaired customers and collaborative opportunities, suffered diminished

goodwill, and incurred injury to existing and prospective economic relationships (*see* § III.J ¶¶ 197–199; § III.M ¶¶ 249–269; § III.N ¶¶ 288–303.)

16. Accordingly, the foregoing allegations plausibly state a claim for tortious interference with existing and prospective business relationships, and Plaintiff seeks the legal relief identified for Count VIII in the Prayer for Relief.

## COUNT IX: ACTUAL FRAUD, FRAUDULENT INDUCEMENT, AND PROMISSORY FRAUD

**Virginia Common Law — *Fraudulent Inducement to Appear on the January Video***

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.G ¶¶ 139–142, § III.H ¶¶ 143–159, § III.I ¶¶ 160–184, § III.K ¶¶ 200–205, § III.M ¶¶ 224–269, and § III.N ¶¶ 307–327.

2. Under Virginia common law, actual fraud and fraudulent inducement require (1) a false representation; (2) concerning a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reasonable reliance by the person misled; and (6) resulting damage.

3. A promise concerning future performance is actionable as promissory fraud when, at the time the promise was made, the promisor had no present intention of performing it; mere later nonperformance, standing alone, is insufficient.

4. In federal court, the circumstances constituting fraud must be pleaded with particularity, while intent, knowledge, and other conditions of mind may be alleged generally.[12]

[12] *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994); *Station #2, LLC v. Lynch*, 280 Va. 166, 172–73 (2010); *SuperValu, Inc. v. Johnson*, 276 Va. 356, 368 (2008); Fed. R. Civ. P. 9(b).

5. Under Virginia law, punitive damages may be awarded in a fraud action upon direct or circumstantial evidence of actual malice, including conduct demonstrating spite, ill will, or conscious disregard of another's rights.[13]

6. Between December 10, 2025, and January 13, 2026, Knapp agreed to host Plaintiff's evidence-supported presentation, scheduled Plaintiff's appearance, requested materials and peaceful conduct, permitted the presentation to proceed, and exercised control over the resulting program (*see* § III.G ¶¶ 139–142; § III.H ¶¶ 143–155; § III.I ¶ 167).

7. Those representations concerned Knapp's then-existing purpose: neutrality, and intended treatment of the controversy.

8. Those representations were material because Knapp controlled the platform, the audience, the questioning, the pictures, the publication, and the continued availability of the episode.

9. Plaintiff relied upon Knapp's professed impartiality by preparing and presenting supporting evidence, appearing publicly, submitting to Knapp's questioning, and exposing his account of the controversy to Knapp's commercial audience.

10. Knapp's acceptance of Plaintiff's stated purpose, preappearance assurances, control over the program, and encouragement of Plaintiff's evidentiary presentation induced Plaintiff to prepare supporting materials, appear publicly, submit to Knapp's questioning, and provide his account and evidence for publication through Knapp's platform (*see* § III.H ¶¶143–159; § III.N ¶¶309–318).

11. Plaintiff alleges upon information and belief that Knapp's professed neutrality was (1) false when made; or that (2) Knapp concealed a then-existing intention or willingness to use Plaintiff's appearance as one half of a retaliatory commercial spectacle rather than as the impartial correction represented.

[13] *See Jordan v. Sauve*, 219 Va. 448, 453–54, 247 S.E.2d 739, 742 (1978).

12. Before the January Video, Knapp had again suggested that Plaintiff merely purchased existing files despite having previously received the correction. *See* § III.H ¶¶ 146–149.

13. The inference of fraudulent intent is further supported by Knapp's favorable on-air remarks and immediate postbroadcast acknowledgment, subsequent provision of the same platform for the opposite narrative, advance warnings to Aldo, later preservation and circulation of Aldo's accusations, and subsequent conduct inconsistent with his professed neutrality (*see* § III.H ¶¶ 153–159; § III.I ¶¶ 160–184; § III.L ¶¶ 206–223; § III.M ¶¶ 224–269; § III.N ¶¶ 307–327).

14. Had Knapp disclosed his true intended treatment of the controversy, Plaintiff would not have participated upon the same terms or supplied his evidentiary presentation for use through Knapp's platform.

15. Knapp's alleged use of professed neutrality to induce Plaintiff's appearance, followed by his deliberate platforming, preservation, and circulation of the contrary retaliatory narrative, demonstrated actual malice toward Plaintiff; thus warranting punitive damages.

16. As a direct and proximate result of Plaintiff's reliance, Knapp obtained Plaintiff's participation, name, image, and evidentiary presentation and used that material as one component of the two-sided controversy he later preserved (*see* § III.H ¶¶ 143–159; § III.N ¶¶ 309–318).

17. Plaintiff incurred preparation and reliance expenditures and lost control over the context and continued use of his participation and materials.

18. Accordingly, the foregoing allegations plausibly state a claim for actual fraud, fraudulent inducement, and promissory fraud concerning Plaintiff's January Video appearance.

19. Plaintiff seeks the legal and equitable relief identified for Count IX in the Prayer for Relief.

## COUNT X: ACTUAL FRAUD, FRAUDULENT INDUCEMENT, AND PROMISSORY FRAUD

**Virginia Common Law — *Fraudulent Inducement to Entrust Physical Inventory***

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.D ¶¶ 56–80, § III.E ¶¶ 81–128, and § III.F ¶¶ 129–138.

2. The governing standards for actual fraud, fraudulent inducement, promissory fraud, punitive damages, and Rule 9(b) particularity are stated in Count IX and incorporated here.

3. On May 5, 2025, through Facebook communications, Knapp represented that he wished to carry Plaintiff's products at shows and serve as "a representative for the brand."

4. Knapp requested guidance concerning what he should tell customers, proposed that Plaintiff supply inventory for display and sale, and thereby represented that he would preserve TSC's source identity and act consistently with Plaintiff's commercial interests. *See* § III.D ¶¶ 61–68.

5. The entrusted vendor arrangement further required Knapp to safeguard Plaintiff's goods, follow authorized pricing and sales instructions, preserve source identification, account for proceeds, and handle unsold inventory according to Plaintiff's directions. *See* § III.E ¶¶ 82–87.

6. On September 24, 2025, during the in-person inventory transfer in Prince William County, Knapp showed Plaintiff the TSC-branded stands he represented would be used for Plaintiff's goods.

7. When Plaintiff expressly instructed Knapp not to place the SS Figures on the Plastic General stands, Knapp replied: "No, I won't do that, man." *See* § III.E ¶¶ 88–93.

8. Those representations were material because Knapp sought possession of SS Figure inventory, together with other TSC goods, and authority over their transportation, display, customer presentation, sale, proceeds, and return — for financial compensation.

9. Plaintiff reasonably relied upon those representations and Knapp's assurances by delivering the inventory, permitting Knapp to transport it to Chicago, and entrusting him with the vendor presentation, sales proceeds, and unsold goods. *See* § III.D ¶ 68; § III.E ¶¶82–88.

10. Plaintiff alleges upon information and belief that Knapp made one or more of those promises without a present intention to perform them, or knowingly concealed his willingness to permit Aldo to control the goods.

11. That inference is supported by Knapp's simultaneous possession of the competing Plastic General stands, his effort to change the subject immediately after assuring Plaintiff he would not use them for the SS Figures, and the subsequent occurrence of the precise display Plaintiff had expressly prohibited. *See* § III.E ¶¶ 88–106.

12. Knapp thereafter allegedly permitted Aldo to exercise control over the goods' display, handling, source presentation, pricing, and disposition beyond whatever authority Plaintiff granted, while the written communications leave unresolved whether any inventory or proceeds remained unaccounted for (*see* § III.E ¶¶ 105–125).

13. The compensation chronology supplies additional circumstantial evidence concerning Knapp's representations and intent. Knapp initially solicited commercial responsibility without identifying a fee, later received compensation, renewed a "free of charge" posture, and again withdrew that position and demanded compensation. *See* § III.D ¶¶ 61–79.

14. Had Plaintiff known that Knapp would disregard the source-identification instruction, permit control or disposition beyond the approved sales arrangements, fail to

account fully, or later alter the represented compensation arrangement, Plaintiff would not have entrusted Knapp with the goods or related commercial authority.

15. As a direct and proximate result, Plaintiff suffered the unauthorized retention and devaluation of inventory, diversion of completed sets, impaired sales proceeds, false source attribution, actual retailer and customer confusion, corrective costs, and injury to TSC's goodwill. *See* § III.E ¶¶ 105–125; § III.F ¶¶ 129–138.

16. Knapp's express assurance that he would not place the SS Figures on Plastic General stands, followed by the precise prohibited presentation and surrender of Plaintiff's inventory to Aldo, demonstrated actual malice toward Plaintiff; thus warranting punitive damages.[14]

17. The foregoing allegations plausibly state a claim for actual fraud, fraudulent inducement, and promissory fraud concerning the entrustment of physical inventory, and Plaintiff seeks the legal and equitable relief identified for Count X in the Prayer for Relief.

## <u>COUNT XI: CONVERSION</u>

***Virginia Common Law — Unauthorized Transfer and Dominion Over Plaintiff's Inventory***

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.D ¶¶ 64–80 and § III.E ¶¶ 81–128.

2. Under Virginia common law, conversion consists of (1) a wrongful exercise or assumption of authority over another person's goods that deprives the owner of possession, or (2) an act of dominion wrongfully exerted over property in denial of or inconsistent with the owner's rights.

3. Plaintiff must possess a property interest in, and an immediate right to, possession of the goods at the time of conversion.

[14] *See Jordan v. Sauve*, 219 Va. 448, 453–54, 247 S.E.2d 739, 742 (1978).

4. Conversion does not require proof of bad faith, willfulness, knowledge, or any other particular mental state, and initially lawful possession may become conversion when a bailee transfers, withholds, disposes of, or otherwise exercises unauthorized dominion over the bailor's property.[15]

5. This Count concerns Knapp's prior unauthorized surrender of possession, Aldo's retention of completed SS Figure sets, and the dismantling, withholding, and devaluation that occurred before Plaintiff regained control.

6. Plaintiff owned the SS Figure inventory and possessed the superior and immediate right to any goods remaining after the authorized sales arrangements.

7. Plaintiff delivered the goods to Knapp for transportation, source-identified display, promotion, authorized sale, accounting, and return, subject to the additional sales arrangements Plaintiff later approved (*see* § III.E ¶¶ 81–88, 108–125).

8. Knapp's original possession was lawful, and the scope of his authority was defined by Plaintiff's instructions and the parties' September 24, September 28, and September 29 communications.

9. Plaintiff authorized the sales arrangements reflected in the parties' September 24, September 28, and September 29 communications.

10. Plaintiff alleges no authorization for retention, transfer, disposition, or failure to account occurring outside those approved arrangements (*see* § III.E ¶¶ 108–125).

11. Plaintiff did not authorize Knapp to surrender the completed inventory to Aldo except upon satisfaction of the agreed payment condition, permit Aldo to dictate which sets would be sold, allow Aldo to dismantle completed packages beyond the approved six-figure

[15] *See McCants v. CD & PB Enterprises, LLC*, 303 Va. 19 (2024); *Economopoulos v. Kolaitis*, 259 Va. 806, 814 (2000); *Simmons v. Miller*, 261 Va. 561, 582 (2001); *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 76 (1956).

groupings, authorize Aldo to discount or retain the goods without payment, or otherwise transfer dominion over Plaintiff's property. *See* § III.E ¶¶109–125.

12. Knapp nevertheless surrendered or permitted Aldo to exercise control over approximately ten completed or reconstructable sets.

13. Aldo retained approximately five completed, bagged sets and returned only loose, dismantled figures to Knapp. *See* § III.E ¶¶ 118–120.

14. That unauthorized transfer and surrender of control constituted an act of dominion inconsistent with Plaintiff's ownership and immediate possessory rights, regardless of whether Knapp personally retained the goods or delivered them to Aldo.

15. Plaintiff seeks the value of only inventory or proceeds proved to have remained outside the authorized arrangements and amounts already paid.

16. The five completed sets retained by Aldo carried an approximate retail value of $199.95. Plaintiff also suffered diminution, reassembly loss, reduced commercial presentation, and other property damage concerning the loose and damaged inventory. *See* § III.E ¶¶ 105–125.

17. Knapp's knowing surrender of Plaintiff's property to Aldo for unauthorized retention, dismantling, discounting, and diversion, despite Plaintiff's limited entrustment and express instructions, demonstrated actual malice toward Plaintiff; thus warranting punitive damages.

18. Accordingly, the foregoing allegations plausibly state a claim for conversion, and Plaintiff seeks the legal and equitable relief identified for Count XI in the Prayer for Relief.

## COUNT XII: NEGLIGENCE

***Virginia Common Law — Breach Of Duty As Bailee***

1. Plaintiff realleges and incorporates by reference all paragraphs within this Complaint as if fully set forth herein and principally incorporates § III.D ¶¶ 64–80, § III.E ¶¶ 81–128, and § III.F ¶¶ 129–138.

2. A bailment arises when a bailor delivers personal property and the bailee accepts possession for a particular purpose while recognizing that the property belongs to another.

3. In a compensated or mutual-benefit bailment, the bailee owes ordinary care for the protection, preservation, authorized disposition, accounting, and return of the bailed property.

4. Under Virginia law, a bailor may proceed in negligence for a bailee's failure to exercise due care or in contract for breach of the bailment undertaking.[16]

5. Liability follows when (1) the bailment created that duty; (2) Defendant breached the duty; (3) the breach proximately caused loss or damage; and (4) Plaintiff suffered resulting injury.

6. Plaintiff delivered, and Knapp knowingly accepted, Plaintiff's physical inventory for the specific commercial purpose of transportation, display, promotion, authorized sale, accounting, and return. Knapp received compensation for those vending services. *See* § III.D ¶¶ 64–80; § III.E ¶¶ 81–88.

7. The resulting mutual-benefit bailment required Knapp to exercise ordinary care in safeguarding the goods, following Plaintiff's instructions, preserving source identification and pricing, supervising authorized sales, accounting for proceeds, and returning or otherwise handling unsold inventory as directed. *See* § III.E ¶¶ 85–86.

8. Knapp breached those duties by displaying, permitting, or failing to prevent the SS Figures from being displayed beneath competing *Plastic General* branding; failing to correct the source-identifying presentation; surrendering control of the goods to Aldo; permitting Aldo to withhold, dismantle, discount, and retain inventory; and failing to

[16] *See K-B Corp. v. Gallagher*, 218 Va. 381, 384 (1977); *Morris v. Hamilton*, 225 Va. 372, 374 (1983).

preserve the completed goods in the condition and commercial presentation in which they were entrusted (*see* § III.E ¶¶ 96–125).

9. Knapp's breach directly and proximately caused the retention and devaluation of Plaintiff's inventory, diminished sales proceeds, loss of completed sets, impairment of the goods' commercial presentation, retailer and customer source confusion, and corresponding corrective and commercial injury (*see* § III.E ¶¶ 105–125; § III.F ¶¶ 129–138).

10. Plaintiff pleads this Count in the alternative to the allegations that Knapp acted knowingly, fraudulently, or with the intent required for conversion or other intentional torts.

11. At minimum, Knapp failed to exercise the ordinary care required of a compensated bailee entrusted with Plaintiff's physical inventory and commercial presentation.

12. Knapp's conscious disregard of Plaintiff's express source-identification and safeguarding instructions, together with his surrender of the entrusted goods and the resulting losses, demonstrated gross negligence at minimum, but the pleadings show actual malice and willful and wanton disregard for Plaintiff's rights; thus warranting punitive damages.

13. The foregoing allegations plausibly state a claim for negligence and breach of duty as bailee, and Plaintiff seeks the legal relief identified for Count XII in the Prayer for Relief.

## V. <u>PRAYER FOR RELIEF</u>

I. WHEREFORE, by reason of the foregoing and all paragraphs incorporated within this Complaint, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant Paul Knapp in all ways legally equitable.

II. Plaintiff requests a declaration that Defendant's conduct alleged in Counts I–IV violated 15 U.S.C. § 1125(a)(1)(A) and (B) through false association, false designation of origin, reverse passing off, unfair competition, and false advertising or commercial promotion.

III. Plaintiff requests a declaration that (1) *Toy Soldier Central*™ and Plaintiff were the production and commercial sources of the finished tangible SS Figures; that (2) Aldo's role was limited to the earlier conceptual-prototype contribution alleged; that (3) Plaintiff's refinement and production work was material and commercially essential; (4) that Plaintiff was not merely a "print house"; and that (5) the current-market SS Figures were created, manufactured, and brought to market as tangible goods entirely by Plaintiff and his retained artist without Aldo's participation.

IV. Plaintiff requests a declaration that Defendant was responsible, at least in part, for (1) creating and developing the defamatory content itself; (2) materially contributed to the challenged false-source and defamatory implications; (3) adopted; and (4) republished those implications through the acts alleged.

V. Plaintiff requests a declaration that Defendant committed defamation *per se* through his initial February Video publication alleged in Count V, his later affirmative republications and targeted dissemination alleged in Count VI, and his July 17, 2026 direct commercial publication alleged in Count VII.

VI. Plaintiff requests a declaration that Defendant tortiously interfered with Plaintiff's existing and prospective business relationships as alleged in Count VIII.

VII. Plaintiff requests a declaration that Defendant fraudulently induced Plaintiff's January Video participation as alleged in Count IX and fraudulently induced Plaintiff's entrustment of physical inventory as alleged in Count X.

VIII. Plaintiff requests a declaration that Defendant converted Plaintiff's property as alleged in Count XI and breached the duties of a compensated bailee as alleged in Count XII.

IX. Plaintiff requests preliminary and permanent injunctive relief prohibiting Defendant from falsely representing Aldo, *The Plastic General*, or any other person as the producer, manufacturer, commercial origin, sponsor, or approving source of tangible goods produced and brought to market by Plaintiff or *Toy Soldier Central*™.

X. Plaintiff requests preliminary and permanent injunctive relief prohibiting Defendant from repeating the specific statements adjudicated false and defamatory in this action, or materially equivalent false statements, including that (1) Plaintiff stole or infringed another person's intellectual property; (2) lacked authority to commercialize the SS Figures; (3) wrongfully withheld money; (4) was merely an incompetent "print house;" (5) was not the legitimate production or commercial source of his finished goods; or (6) covertly attacked Knapp's competing Monuments Men product by spreading an AI accusation.

XI. Plaintiff requests an order requiring Defendant, within ten days after entry of final judgment, to delete every copy of the February Video within Defendant's control.

XII. Plaintiff requests an order requiring Knapp, within ten days after entry of final judgment, to reveal any copies or republications of the February Video outside Defendant's control.

XIII. Plaintiff requests an order requiring Defendant to publish a conspicuous, public, written, Court-approved corrective post on the TST Podcast's YouTube community page and Defendant's principal toy-soldier Facebook social-media account, to pin or otherwise prominently maintain the post for at least ninety days, and to disable comments on the post.

XIV. Plaintiff requests that the corrective post state something to the general effect of: "I, Paul Knapp, retract all of my former false statements regarding Luciano Castellani and *Toy Soldier Central*™ and will no longer be defaming him or his businesses."

XV. Plaintiff alternatively requests a notice retracting adjudicated false or defamatory statements, correcting the commercial source and authorship of the goods at issue, and stating that Defendant will not repeat those statements or their material equivalents.

XVI. Plaintiff requests an order requiring Defendant to provide a sworn compliance report identifying each removal, correction, retraction, account, platform, recipient, and responsive action taken under the injunction.

XVII. Plaintiff requests an accounting and production of records concerning gross revenue, sales, watch time, views, engagement, advertising, YouTube Premium distributions, subscriptions, channel memberships, viewer payments, sponsorships, affiliate commissions, promotional consideration, product sales, deductions, expenses, and net profits attributable to the January Video, the February Video, their republications, or related derivative content to the extent relevant to relief proved under the pleaded claims.

XVIII. Plaintiff requests disgorgement under 15 U.S.C. § 1117(a) of Defendant's net profits attributable to the February Video's false-source, false-association, and false-advertising content, its republications, related derivative content, resulting product sales, and other commerce proximately attributable to the Lanham Act violations, with Defendant required to prove any claimed costs or deductions.

XIX. Plaintiff requests enhancement of his Lanham Act damages, up to three times the actual-damages award where authorized and necessary to constitute compensation, together with Defendant's profits, subject to the principles of equity under 15 U.S.C. § 1117(a).

XX. Plaintiff requests restitution or rescissionary relief for the benefit attributable to Plaintiff's January Video appearance and evidentiary presentation to the extent obtained through the fraudulent inducement alleged in Count IX and proved independently of reputational injury.

XXI. Plaintiff requests an accounting concerning any inventory or proceeds proved to have remained outside any authorized arrangements and amounts already paid.

XXII. Plaintiff requests the value of any inventory or proceeds proved to have remained outside the authorized arrangements and amounts already paid.

XXIII. Plaintiff requests compensatory damages for lost net profits, diverted goodwill, impaired commercial relationships, and Defendant's corresponding profits.

XXIV. Plaintiff requests an award of up to $750,000 in presumed and general damages for the defamatory initial February Video publication alleged in Count V.

XXV. Plaintiff requests an award of up to $750,000 in presumed and general damages for the later affirmative republications and targeted dissemination alleged in Count VI.

XXVI. Plaintiff requests an award of up to $750,000 in presumed and general damages for the July 17, 2026 direct commercial publication alleged in Count VII.

XXVII. Plaintiff requests an award of actual, consequential, and compensatory commercial damages in an aggregate amount to be determined at trial but presently demanded up to $500,000, including lost net profits, diminished goodwill, lost affiliate and promotional income, impaired commercial opportunities, corrective-advertising and mitigation costs, reliance damages, the fair value of fraudulently procured commercial benefits, and other pecuniary injury recoverable under Counts I–IV and VIII–X, without duplicative recovery for the same injury.

XXVIII. Plaintiff requests an aggregate award of punitive damages of up to $350,000, the maximum permitted by Virginia Code § 8.01-38.1, based upon Defendant Paul Knapp's willful, malicious, retaliatory, commercially motivated, and consciously indifferent conduct, in order to punish Defendant and deter similar conduct.

XXIX. Plaintiff requests prejudgment interest from the dates the respective injuries occurred at the lawful rate, post-judgment interest under 28 U.S.C. § 1961, taxable costs, and reasonable attorney's fees if counsel is retained and such fees are recoverable, including under the exceptional-case provision of 15 U.S.C. § 1117(a).

XXX. Plaintiff requests an order requiring Defendant to preserve and produce all channel analytics, monetization records, payment statements, sponsorship records, sales records, customer communications, inventory records, and other documents necessary to determine the revenue, profits, losses, and corrective relief described above.

XXXI. Plaintiff requests such other and further legal or equitable relief to which he is legally entitled to, but has not specified within the four corners of these pleaded words.

XXXII. Plaintiff requests such other and further legal or equitable relief as the Court deems just and proper.

XXXIII. Because additional property loss, Defendant's attributable profits, restitutionary benefit, Lanham Act enhancement, interest, costs, and other amounts depend upon proof or records within Defendant's control, Plaintiff demands total monetary relief up to $6,000,000.01, exclusive of prejudgment interest, post-judgment interest, taxable costs, and any separately recoverable attorney's fees.

XXXIV. To the extent multiple claims permit recovery for the same injury, Plaintiff seeks one satisfaction of that injury and elects the lawful theory or remedy providing the greatest permissible recovery; this limitation does not bar separate recovery for distinct publications, distinct loss, distinct pecuniary injury, or other nonoverlapping relief.

Total Monetary Damages Prayed For: Up to $6,000,000.01, *exclusive of interest, costs, and any separately recoverable attorney's fees.*

## VI. RESERVATIONS, JURY DEMAND, AND SIGNATURE BLOCK

### A. Reservations of Rights ◇

1. Plaintiff reserves all rights afforded to him under applicable law.

2. Plaintiff is proceeding *pro se*; his pleadings must be construed liberally to ensure that meritorious claims are not dismissed due to technical pleading deficiencies.

3. Because Plaintiff is an unlicensed litigator appearing *pro se*, he is entitled to all procedural protections and interpretive benefits afforded to *pro se* litigants under federal law, regardless of any perceived level of legal education, sophistication, or competence.

### B. Jury Demand ◇

Plaintiff hereby demands trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

### C. Signature Block ◇

*"'Equal Justice Under Law', for no litigant stands above the law or beneath the bar."*

Plaintiff brings this complaint with sincere reverence for the Court & the judicial process.

Respectfully submitted,

/s/ Paulo C. Lisboa                    Date: 08/14/2026

Paulo C. Lisboa (*Pro Se* Plaintiff)
3360 Post Office Road | PO Box No. 1063
Woodbridge, Virginia, 22193
Lisboa@RocketDocket.Legal * Tel: 571-999-4364

*"To Litigate With Regal Honor"*
*—Circa 2025.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| | ) | |
| | ) | Case No.: ______________ |
| PAULO C. LISBOA, | ) | |
| (D/B/A/ LUCIANO CASTELLANI) | ) | |
| (D/B/A/ TOY SOLDIER CENTRAL™) | ) | |
| | ) | ⁂ |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| PAUL KNAPP, | ) | ⁂ |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>LOCAL RULE 83.1(N)(2) CERTIFICATION</u>**

**I declare under penalty of perjury that no attorney has prepared, or assisted in the preparation of:**

**<u>PAULO C. LISBOA'S COMPLAINT AGAINST PAUL KNAPP</u>**

**(Title of Document)**

___________Paulo C. Lisboa__________

Name of *Pro Se* Party (Print or Type)

___________/s/ Paulo C. Lisboa________

Signature of *Pro Se* Party

Executed on: _____08/14/2026_____ (Date)